BUNGE CORPORATION, Plaintiff-Appellee, v. THE NORTHERN TRUST COMPANY, as Trustee, *et al.*, Defendants-Appellants (Mary Blake, Indiv., and as Custodian for Therese M. Blake, *et al.*, Defendants).

Fourth District   No. 4—93—0144

Argued September 14, 1993.—Opinion filed October 22, 1993.

Steven M. Helm, of Dukes, Martin, Helm & Ryan, Ltd., of Danville, and Stephen C. Sandels (argued), of McDermott, Will & Emery, of Chicago, for appellants.

Stephen R. Patton (argued) and David T. Erie, both of Kirkland & Ellis, of Chicago, and Howard W. Small, of Thomas, Mamer & Haughey, of Champaign, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

This case involves the interpretation of a stock purchase agreement and whether plaintiff Bunge Corporation (Bunge) is entitled to a purchase price adjustment under the terms of that stock purchase agreement. The trial court held Bunge was so entitled and entered judgment in the amount of $587,916.40. We affirm.

In 1978, Bunge began acquisition negotiations to purchase Lauhoff Grain Company (Lauhoff), a business which produced textured vegetable protein (TVP), a substance used in the production of

pet food, from its shareholders (sellers). After approximately three face-to-face meetings and numerous telephone conversations, the parties entered into a stock purchase agreement on October 5, 1978. Under the agreement, the sellers, some 66 individuals or entities, sold all 2.5 million outstanding shares of stock of Lauhoff to Bunge for a total price of $37.5 million. At the time of the negotiations, 1.5 million of the outstanding shares of stock were held in trust by the Northern Trust Company (Northern Trust), trustee of the trusts of Howard J. Lauhoff, founder and principal owner of Lauhoff, and Bernice D. Lauhoff. Under the terms of the stock purchase agreement, the "Representing Sellers" were the estate of Howard J. Lauhoff, Floyd W. Brown and James G. Davis. The Representing Sellers owned 1.59 million shares of stock in Lauhoff. The purchase price was payable in three installments, and the first payment of $28.75 million was paid at closing on January 3, 1979. The second installment of $5 million (minus certain purchase price adjustments) was paid on June 11, 1979, and the final installment of $3.75 million (minus certain purchase price adjustments) was paid on January 3, 1983, the fourth anniversary of the closing date.

Paragraph 3(a)(i) of the stock purchase agreement provides that the purchase price of the stock was based on, among other things: "the accuracy of the representations and warranties set forth in Exhibit C attached hereto as of the date hereof and as of the Closing Date."

Paragraph 3(a) further provides:

> "If it should be found that *** (iii) there are any liabilities of or claims against the Corporation arising out of any contract or commitment in breach of the representations or warranties made by the Representing Sellers in paragraph 6 hereof except as shall have been reflected or accrued in said Financial Statements or any contract or commitment entered into by the Corporation in violation of the provisions set forth in paragraph 5 thereof ***, then, in any and all such events the purchase price for all the shares of the Common Stock will be reduced pro rata accordingly on a dollar-for-dollar basis."

Paragraph 6 is entitled "Representations and Warranties" and provides, in pertinent part, that the Representing Sellers:

> "hereby represent and warrant to the Buyer that the statements set forth in Exhibit C attached hereto are true as of the date hereof and shall be true as of the Closing Date as if given on and as of the Closing Date."

Paragraph 6(c) provides:

"All representations and warranties made by the Representing Sellers or by the Buyer in this agreement shall survive the Closing Date; provided, however, that except for the representations and warranties set forth in paragraphs (c), (d), (e), (f), (g) and (q) of Exhibit C, after the Closing Date the Buyer's sole remedy for any breach of a representation or warranty made by the Representing Sellers shall be limited to the right to make a claim, pursuant to paragraph 3(b) hereof, that the purchase price is subject to adjustment in accordance with paragraph 3(a) hereof."

Finally, the warranty relevant to this appeal, warranty ($l$), is found in exhibit C to the stock purchase agreement, and provides:

"[($l$)] The Corporation owns, is permitted to use, or licensed under all formulae, secret processes, know-how, patents, patent applications, trademarks, trade names and copyrights, if any, used by it in its present business. The Representing Seller does not own any direct or indirect interest in any such formula, secret process, know-how, patent, patent application, trademark, trade name, copyright or license."

In June 1976, Ralston Purina Company (Ralston) wrote a letter to Lauhoff advising it had a patent covering the production of TVP and it would be willing to grant Lauhoff a license under that patent. In August 1976, Lauhoff replied it was not interested in a license from Ralston since it had a license to produce TVP from Archer Daniels Midland (ADM).

In early May 1981, Ralston informed Lauhoff that it had instituted a patent infringement lawsuit against Far-Mar-Co in Federal court in Kansas. Once it obtained a favorable ruling, Ralston intended to sue all other patent infringers, presumably including Lauhoff. Ralston again offered Lauhoff a license to produce TVP. Again, Lauhoff replied to Ralston that, although it was aware of the availability of a license under Ralston's patent, such a license was unnecessary because Lauhoff had a license from ADM to produce TVP. As of May 11, 1981, Bunge notified Northern Trust of a possible purchase price adjustment due to this alleged patent infringement.

Next, as the fourth anniversary of the closing date was approaching, on November 29, 1982, Bunge informed the sellers that the final installment was due and that certain purchase price adjustments were to be made. The undetermined Ralston patent infringement claim was alleged by Bunge to be something which could cause a purchase price adjustment.

On January 3, 1983, Bunge sent Northern Trust a check for approximately $3.75 million representing the final installment of the purchase price. This amount included certain purchase price adjustments as listed in the November 1982 letter. However, the Ralston patent infringement claim was not included because it was still undetermined. The following paragraph was included in this letter:

> "The purchase price will be subject to further adjustment if and when the amounts of items 12 and 13 of the schedule dated 11/30/82 are determined, or if any additional items should arise."

Items 12 and 13 of the "schedule dated 11/30/82" were included in Bunge's November 1982 letter as were the Ralston patent infringement claim and another similar undetermined patent infringement claim. At this time, Bunge's collateral was released.

On January 15, 1983, after Bunge's check had been deposited and cleared, Northern Trust sent a letter to Bunge thanking it for the cooperation in effecting payment on the remaining portion of the purchase price. Northern Trust stated:

> "In Mr. Goodrow's letter dated January 3, 1983[,] transmitting the payment of the remaining portion of the purchase price, the statement is made that '[t]he purchase price will be subject to further adjustment if and when the amounts of items 12 and 13 of the Schedule dated 1/30/82 [sic] are determined or if additional items should arise.' We disagree with that statement. The Stock Purchase contract does not contemplate any refund of purchase price paid, but rather only an adjustment of purchase price to be paid. As all of the purchase price has been paid, no further adjustment can be made."

On January 19, 1983, Bunge replied that it disagreed with this paragraph of the letter. In its letter Bunge stated:

> "Adjustment of the purchase price, as provided in paragraph 3 of the agreement (including any adjustment that might arise by virtue of paragraph 6(c)), is in no way limited by the timing of the purchase price payments made according to the schedule set forth in paragraph 2."

Bunge further stated in its letter:

> "if there had been any such limitation (or even any suggestion of one when we discussed my letters to you of November 29 and 30, 1982) there would have been a full or partial hold back, of course, of the payment that was made on January 3, under cover of Mr. Goodrow's letter."

In April 1984, Ralston informed Lauhoff that it had won its patent infringement case against Far-Mar-Co. Northern Trust received a copy of this letter. The court of appeals affirmed the district court's decision. *Ralston Purina Co. v. Far-Mar-Co* (Fed. Cir. 1985), 772 F.2d 1570.

Ralston filed a lawsuit against Lauhoff in November 1985 for patent infringement. Bunge notified Northern Trust, which declined to participate in settlement negotiations. In May 1986, Bunge and Ralston eventually reached a settlement for $1.2 million. In this settlement agreement, Lauhoff admitted liability for past infringement of Ralston's patent.

Bunge then demanded from the sellers a purchase price adjustment in the amount of $648,000 (54% of the settlement amount), which figure was calculated pursuant to paragraph 3(a) of the stock purchase agreement. In response, Northern Trust filed a preemptive suit in the United States District Court for the Northern District of Illinois seeking a declaration that the sellers were not liable for a purchase price adjustment. Bunge counterclaimed for the same amount as the alleged purchase price adjustment allegedly due under the stock purchase agreement.

The district court found Lauhoff did not own or have a license to use one of the processes being used in its business, namely Ralston's patent for making TVP. This failure was a breach of the warranty provided for in the stock purchase agreement. The district court granted Bunge's motion for summary judgment on liability. (*Northern Trust Co. v. Bunge Corp.* (N.D. Ill. May 10, 1988), No. 86—C—4805 (unpublished decision).) Northern Trust appealed and the court of appeals *sua sponte* raised the issue of whether Northern Trust had properly brought suit in Federal court. On March 30, 1990, the court of appeals dismissed Northern Trust's action and Bunge's counterclaim on the ground the Federal jurisdiction was lacking. *Northern Trust Co. v. Bunge Corp.* (7th Cir. 1990), 899 F.2d 591.

On September 6, 1989, the Federal district court in Peoria, Illinois, held that the Ralston patent was unenforceable because it had been procured in 1976 by means of conduct on the part of Ralston that defrauded the United States Patent and Trademark Office. (*Ralston Purina Co. v. A.E. Staley Manufacturing Co.* (C.D. Ill. Sept. 6, 1989), No. 84—1378 (*Staley*).) This decision was affirmed by the court of appeals on July 5, 1990. *Ralston Purina Co. v. A.E. Staley Manufacturing Co.* (Fed. Cir. 1990), 909 F.2d 1494.

Bunge filed this action on August 1, 1990. Both Bunge and Northern Trust filed motions for summary judgment which were denied.

These orders are not being appealed. Before the trial began, Bunge settled with a group of shareholders representing approximately 30% of the shares sold. The trial commenced against the Lauhoff trusts represented by Northern Trust and eight individual shareholders. Following a week-long bench trial, the trial court entered judgment in favor of Bunge. Specifically, the court made the following findings:

"1. Bunge has established that Warranty (*l*) was breached by Lauhoff.

2. Bunge is entitled to a purchase price adjustment after the final installment was paid on January 3, 1983.

3. Bunge settled the Lauhoff action with Ralston in good faith with reasonable anticipation of liability.

4. Bunge did not fail to mitigate damages.

5. Bunge's damages were incurred as a result of a breach of warranty rather than its own actions."

A final judgment order was entered on January 22, 1993, and Northern Trust timely filed its notice of appeal. Four of the eight individual shareholders elected not to appeal. Findings (4) and (5) are not at issue here.

Northern Trust essentially alleges two arguments to support its contention that the trial court erred in entering judgment in favor of Bunge. First, Northern Trust alleges the language and structure of the stock purchase agreement indicate no purchase price adjustment was due. Second, Northern Trust alleges the judgment below should be reversed because Bunge's settlement with Ralston was not made in good faith, *i.e.*, in reasonable anticipation of liability. Northern Trust asserts Bunge knew or should have known that Ralston had engaged in conduct amounting to fraud upon the patent office in procurement of the patent which Lauhoff allegedly infringed.

I. Language And Structure Of The Stock Purchase Agreement

Northern Trust first asserts that the stock purchase agreement must be strictly construed against Bunge as the party which drafted it when resolving questions of ambiguity. Murray Warschauer, secretary and general counsel for Bunge, prepared the initial draft of the stock purchase agreement in early September 1978. The draft then underwent a number of changes through negotiations with Stanley Meadows, a partner at the law firm of McDermott, Will and Emery, counsel for Northern Trust. The parties had three face-to-face meetings and 10 telephone conversations regarding the language and structure of the stock purchase agreement.

■ The record on appeal shows there were two highly sophisticated parties negotiating this stock purchase agreement. For Bunge, Warschauer has been licensed to practice law for 43 years, has worked for Bunge for 28 years and has been involved with dozens of transactions like this. On the other hand, Meadows has been licensed for 22 years and his specialty involves corporate practice, securities offerings, and mergers and acquisitions such as this. He has handled 60 such acquisitions. Accordingly, the policy reasons for strict construction against the drafter of a document, *i.e.*, the avoidance of adhesion contracts and requiring the party who chose the words used in the document to be bound by those words, are not present in this instance. Further, the doctrine of *contra proferentem* is at best a secondary rule of interpretation, a last resort which may be invoked after all the ordinary interpretative guides have been exhausted. (*Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, 798, 405 N.E.2d 1051, 1057.) Thus, we need only resort to this rule of construction if we cannot otherwise ascertain the parties' intent.

The primary objective in construing a contract is to effectuate the parties' intentions when entering the agreement. Absent ambiguity, the intention of the parties must be gathered from the language used in the contract, not from a party's construction of that language. A contract is ambiguous if it is subject to more than one reasonable interpretation. The existence of an ambiguity in a contract must be determined as a question of law by the court. If the terms of an alleged contract are ambiguous or are capable of more than one interpretation, parol evidence is admissible to ascertain the parties' intent. (*Pre-Fab Transit Co. v. Northbrook Property & Casualty Insurance Co.* (1992), 235 Ill. App. 3d 103, 106, 600 N.E.2d 866, 868-69.) However, a document is not ambiguous merely because the parties fail to agree upon its meaning. In determining the intent of an unambiguous instrument, the court must consider the entire document, giving words their plain and ordinary meaning. (*Little v. Tuscola Stone Co.* (1992), 234 Ill. App. 3d 726, 728, 600 N.E.2d 1270, 1272.) Factual determinations regarding the meaning of contract language should not be overturned unless they are contrary to the manifest weight of the evidence. *Marathon Plastics, Inc. v. International Insurance Co.* (1987), 161 Ill. App. 3d 452, 459-60, 514 N.E.2d 479, 483.

## A. *Warranty (l)*

■ Northern Trust contends the trial court erred in concluding that warranty (*l*) was a noninfringement warranty. Warranty (*l*) states:

> "[(*l*)] The Corporation owns, is permitted to use, or licensed under all formulae, secret processes, know-how, patents, patent applications, trademarks, trade names and copyrights, if any, used by it in its present business. The Representing Seller does not own any direct or indirect interest in any such formula, secret process, know-how, patent, patent application, trademark, trade name, copyright or license."

The trial court found:

> "The first sentence is a representation that the corporation was permitted to use any patent. This appears to the court to be a non-infringement warranty. The second sentence is a representation that the stockholders did not own any interest in any patent and was meant to prevent royalties being paid to shareholders after the company had been purchased. That second sentence was clearly an ownership warranty."

Northern Trust alleges that the first sentence in warranty (*l*) is not a noninfringement warranty because the words "infringe" or "infringement" do not appear in this sentence. Rather, it suggests both sentences in warranty (*l*) are "ownership" warranties and are the obverse of each other, *i.e.*, the corporation owns or is permitted to use all the necessary licenses and permits for its business and the Representing Sellers do not own any of these intellectual property rights. Northern Trust notes that Bunge could have tried to negotiate a noninfringement warranty into exhibit C had it desired one, but further notes that broad noninfringement warranties are unusual and a buyer normally would have to pay additional money for such a warranty because of the large assumption of risk.

Bunge first counters that the plain language of warranty (*l*) refutes Northern Trust's interpretation. Bunge contends Northern Trust's interpretation that both sentences of warranty (*l*) were ownership warranties would render the first sentence meaningless. Bunge also disputes the contention that the first sentence must contain the words "infringement" or "infringe" in order to be a noninfringement warranty. Bunge asserts warranty (*l*) applies to any claim that Lauhoff was using any intellectual property right that it did not own or did not have the right to use.

Warranty (*l*) is not ambiguous. In reading this clause and giving the words their ordinary and usual meaning, the first sentence simply states that Lauhoff has all the necessary permits, licenses, or patents to do its business. The language "permitted to use" can be construed to mean that it is not infringing on somebody else's intellectual property rights. If Lauhoff was doing something (*i.e.*, using a patented

process) that it was not "permitted to use," then it would be infringing upon that patent. Thus, this sentence is a noninfringement warranty. Moreover, the second sentence merely states that the Representing Seller does not own any interest in the intellectual property rights used by Lauhoff in its business. If the Representing Seller did own an interest in such intellectual property rights, Lauhoff would have to pay the Representing Seller a fee for using that right. Thus, this sentence merely states that the Representing Seller does not own any interest in any of the patents or other intellectual property rights used by Lauhoff in its business. The trial court's determination as to the meaning of warranty (*l*) was not against the manifest weight of the evidence.

As further support that warranty (*l*) is not a noninfringement warranty, Northern Trust asserts that the trial court's construction would conflict with the "use of property" exclusion in paragraph 3(a)(i) of the stock purchase agreement. Paragraph 3(a)(i) provides there may be a purchase price adjustment:

> "[i]f it should be found that (i) there are any liabilities of the Corporation, whether accrued, absolute, contingent, or otherwise existing on January 31, 1978, *** arising out of any transaction entered into, or state of facts existing on or before said date; but excluding *** *use of property after January 31, 1978*." (Emphasis added.)

Northern Trust believes this exclusion covers any "use" of intellectual property rights covered by a patent owned by a third party, because infringing upon a patent involves an "improper use" of the intangible property and the right to the exclusive use of the patented invention. Northern Trust concludes that if the first sentence of warranty (*l*) is a noninfringement warranty, it is in direct conflict with this section.

The trial court stated:

> "The court finds that the word 'use' in that paragraph [3(a)(i)] is not the type of use of property envisioned by warranty [(*l*)]. The 'use' of a thing means that one is entitled to hold or in some manner benefit therefrom. That is the intent of the parties when the term is used in warranty [(*l*)]. The court finds that the word 'use' found in paragraph 3(a)(i) simply refers to a verb. Therefore, there is no inconsistency in finding that warranty [(*l*)] is a non-infringement warranty and in giving effect to paragraph 3(a) in adjusting a purchase price."

Paragraph 3(a)(i) states that if there are certain kinds of liabilities of Lauhoff not reflected in the financial statements existing on January 31, 1978, the purchase price may be subject to adjustment. How-

ever, that paragraph specifically excludes liabilities for the "use of property" after that date. This paragraph is ambiguous, and thus the trial court properly considered parol evidence to ascertain the parties' intent. Warschauer testified this paragraph could include a patent infringement which could be a contingent liability not reflected in the financial statements. This would trigger a purchase price adjustment. Likewise, Meadows testified the "use of property" as used in this paragraph could include the use of both tangible and intangible property and simply excluded liability for that use of property after January 31, 1978. His interpretation of that provision was that the sellers were not to be obligated for the operations of the business after January 31, 1978, and that liabilities and obligations for use of property after that date were excluded.

This "use of property" provision could include the use of intellectual property and Lauhoff's improper use of someone else's patented process. However, as Bunge notes, the clauses found in paragraph 3(a) are independent bases for purchase price adjustments and because a certain claim may not be made under one provision does not necessarily mean it cannot be made under another provision. Thus, even though liability for the use of property after January 31, 1978, would not be a ground for a purchase price adjustment under paragraph 3(a)(i), under paragraph 3(a)(iii) there could still be a purchase price adjustment for a breach of warranty (*l*) made by the Representing Sellers. Thus, the trial court's conclusion that construing warranty (*l*) as a noninfringement warranty does not conflict with the "use of property" provision of section 3(a)(i) was not against the manifest weight of the evidence.

Northern Trust also asserts that construing warranty (*l*) as a noninfringement warranty would conflict with warranty (h) of exhibit C. Northern Trust argues that the settlement in 1986 with Ralston arose in the ordinary course of business because Ralston sued Lauhoff for an alleged infringement of the TVP process which it had used for years "in the ordinary course of its business."

Warranty (h) provides:

"(h) Except as and to the extent reflected in full and accrued in full and the audited consolidated financial statements of the Corporation and its subsidiaries as of January 31, 1978, prepared and certified by Coopers and Lybrand, Certified Public Accountants, (hereinafter called 'Financial Statements'), the Corporation has not incurred any material liability or obligation of any nature whether absolute, accrued, contingent or otherwise, and whether due or to become due, without limiting the

generality of the foregoing, any liability for taxes, Federal, state or local, income, excise, sales or others, *except for matters disclosed herein* and *liabilities incurred* subsequent to the date of the Financial Statements *in the ordinary course of business.*" (Emphasis added.)

As to warranty (h), the trial court concluded:

"In warranty (h) the sellers represent that the corporation has not incurred any material liability of any nature due or to become due except for liability incurred in the ordinary course of business subsequent to the date of the financial statements. The parties differ as to whether a relationship exists between warranty (h) and warranty [(*l*)]. The sellers say that there is a relationship and, because of that relationship, there can be no recovery. The buyer argues that there is no such relationship. The court finds that, even if the two warranties are related, warranty (h) in this case will not apply since a patent infringement is not a liability incurred as a part of the 'ordinary course of business.'"

Bunge contends that warranty (*l*) and warranty (h) are separate and independent bases for purchase price adjustments and even if the warranty (h) exclusion for liabilities incurred in the ordinary course of business applied to this case, that would not necessarily mean warranty (*l*) was not breached. Moreover, Bunge asserts, as did the trial court, that patent infringement is not a liability normally incurred as a part of the ordinary course of business.

Giving these words their plain and ordinary meaning, we conclude that this clause merely states Lauhoff has no liabilities except those reflected in the financial statements as of January 31, 1978, or those incurred in the ordinary course of business. Because this company is an ongoing business, there will always be liabilities incurred in the ordinary course of business, *i.e.*, grain purchases, overhead expenses, salaries, *et cetera*. As the court noted, liability for patent infringement is not normally the type of liability incurred in the ordinary course of business. Thus, construing warranty (*l*) as a noninfringement warranty does not conflict with warranty (h) and the trial court's conclusion was not against the manifest weight of the evidence.

## B. *Was Warranty (l) Breached?*

■■ Bunge is only entitled to a purchase price adjustment if warranty (*l*) was breached. Northern Trust offers several alternatives to

show that warranty (*l*) was not breached. Each alternative will be briefly addressed below.

First, Northern Trust contends that since it had a license from ADM to produce TVP, the representations of warranty (*l*) were true. As to this argument, the trial court responded:

> "The fact that Lauhoff was licensed to use a different patent—that is that patent belonging to ADM—is not relevant. The sellers did not warrant that Lauhoff was licensed to use *a* patent. They warranted that Lauhoff owned, was permitted to use, or was licensed under *all* patents used by it in its present business. In addition, whether it was Ralston's 'process' that Lauhoff used without a license or Ralston's 'patent', makes no difference. The sellers' warranty was that Lauhoff owned or was permitted to use all processes and patents in its business." (Emphasis in original.)

Warranty (*l*) provides Lauhoff owned, was permitted to use or was licensed under all patents used in its business. In fact, Lauhoff was using a patent (the one owned by Ralston) to produce TVP, without permission, *i.e.*, it had no license from Ralston to use that patent, as evidenced by the correspondence between Lauhoff and Ralston. Thus, the representations of warranty (*l*) were not true.

Northern Trust also asserts there was no breach of warranty (*l*) because Lauhoff had permission from Ralston to use the patent up until May 6, 1981, when Ralston indicated it planned to prosecute any infringers when, and if, it won its litigation with Far-Mar-Co. Northern Trust asserts warranty (*l*) had to be breached as of the closing date, January 3, 1979, and this warranty was not being breached as of that date because Lauhoff still had permission from Ralston to use the patent. Northern Trust alleges this permission is evident from the letters from Ralston to Lauhoff offering a license, for a royalty fee, to use the patent to produce TVP.

As Bunge notes, Ralston was not giving "permission" to use its patent because it offered a license to Lauhoff in exchange for a royalty. If Ralston was truly giving permission, it would not be seeking monetary compensation for the use of the patent. Moreover, the letters between Ralston and Lauhoff indicate that their purpose was merely to bar any potential *laches* defense by Lauhoff.

The trial court concluded:

> "The court finds that the non-infringement warranty was breached by Lauhoff's use of a patent for manufacturing texturized vegetable protein. The patent belonged to Ralston-

Purina Company and Lauhoff did not own it, was not permitted to use it and was not licensed under that patent."

Thus, the record on appeal does not support Northern Trust's contention that Lauhoff had permission to use the Ralston patent. The correspondence indicated a contrary intent by Ralston.

Finally, Northern Trust alleges that when the Federal district court held in *Staley* that the Ralston patent was obtained through fraud, the patent was rendered void *ab initio*. (*Staley*, No. 84—1378 (unpublished decision).) Thus, because the patent was as if it never was issued, there could be no breach at closing, and Bunge is not entitled to a purchase price adjustment.

The law is clear that an invalid patent cannot be infringed. (*Union Carbide Corp. v. American Can Co.* (N.D. Ill. 1983), 558 F. Supp. 1154, 1162 (and cases cited therein).) Northern Trust may be correct in its proposition that an invalid patent is void from its inception; however, the Federal district court in *Staley* declared the patent *unenforceable* rather than *invalid*. In a transcript of its oral pronouncement (included in this court's record on appeal), the district court stated: "I have no problem in making that change [from a finding of invalidity to a finding of unenforceability] and saying that as a result of the inequitable conduct that I have found that the patent is not enforceable." Further, in its written supplemental findings, the court found: "Patent number 3940495 is held to be unenforceable by virtue of inequitable conduct." (*Staley*, No. 84—1378, slip op. at 5 (unpublished decision).) Moreover, the court of appeals affirmed the district court's decision that this patent was unenforceable because of inequitable conduct. *Ralston Purina Co.*, 909 F.2d 1494.

Thus, Ralston's patent on the process to produce TVP is only unenforceable against alleged infringers. It is still an existing and valid patent. Accordingly, as of the closing date, Lauhoff could have still been infringing upon Ralston's patent, thereby breaching warranty (*l*). However, Ralston simply could not bring any action against Lauhoff for that infringement. Whether a breach of contract has occurred is a question of fact which will not be disturbed unless the finding is against the manifest weight of the evidence. (*Borys v. Rudd* (1990), 207 Ill. App. 3d 610, 618, 566 N.E.2d 310, 315.) The trial court's conclusion that the sellers breached warranty (*l*) was not against the manifest weight of the evidence.

### C. *What Remedy is Available to Bunge?*

■ Since the sellers breached warranty (*l*), the final question is whether Bunge has any remedy available. Northern Trust first alleges

Bunge is not entitled to a purchase price adjustment since the final installment of the contract price has been paid. Northern Trust asserts that since the final installment has been paid, Bunge is in fact seeking a "refund" rather than a "purchase price adjustment," and such a "refund" is not contemplated by the stock purchase agreement.

Bunge contends the plain language of the stock purchase agreement expressly provides that all warranties shall survive the closing date and specifies no ending date. Paragraph 3(b) of the stock purchase agreement provides that Bunge must notify the sellers of a potential price adjustment within a "reasonable time" after the likelihood of such reduction becomes known, except inventory adjustment claims which have to be made within 60 days of closing. Bunge asserts that the fact that there is a 60-day time limit for inventory claims, but no such time limit for other claims, indicates the parties intended for there to be no such time limit for all other claims. Bunge refutes Northern Trust's "refund" and "adjustment" distinction, noting "adjustment" is broader than "refund" and could include "adjustments," both before and after the final installment is paid.

Finally, Bunge notes that it believed that an adjustment could be made after the final installment was paid, most notably evidenced by its January 3, 1983, letter transmitting the final installment, in which it specifically stated the purchase price would be subject to further adjustment if and when the amounts of the Ralston claim became determined. Bunge notes that Northern Trust did not take issue with this understanding before it deposited and cashed the check and it was only *after* it had actually received the money that it began to dispute that there could be such a purchase price adjustment.

The trial court concluded:

> "The Court finds that Paragraph 3(a) does not limit purchase price adjustments to pre-closing claims. Paragraph 6(c) of the Agreement expressly provides that sellers' warranties extend beyond closing: 'All representations and warranties made by the Representing Sellers or by the Buyer in this Agreement shall survive the closing date.' It is clear that the intent of the parties in this Section was to overcome the Doctrine of Merger and the problem arising if the Buyer didn't know of a breach at the time of the closing. The second part of Paragraph 6(c) limited the Buyer's remedy after closing to the right to make a claim for a purchase price adjustment in accordance with Paragraph 3(a) of the agreement.

\* \* \*

Paragraph 3(b) required the Buyer to notify the Seller of any potential payment that could result in a reduction of the purchase price under Subparagraph (a) within a 'reasonable' time after the likelihood of such a reduction became known to Buyer. There was a requirement that if the possible reduction was due to any inventory adjustment, notice was to be given no later than 60 days after date of closing. As to other claims, there was no post-closing time limit after which there could be no reduction of a purchase price.

It is true that Paragraph 6(a) makes reference to the closing date. That reference refers to the time when the accuracy of the Sellers' warranty was to be judged. It does not apply to the time period for which damages are claimed. That paragraph does not state the damages resulting from breaches of warranty must exist as of the closing. As a practical matter, a claim for damages for breach of warranty nearly always arises after closing."

Neither of Northern Trust's contentions establishes that Bunge is not entitled to a purchase price adjustment. The "refund" versus "adjustment" argument is merely a semantical distinction. As Bunge notes, an "adjustment" could be a "refund." An adjustment merely means a change in the price, either an increase or a decrease. An adjustment after the final payment is a refund. The stock purchase agreement does not state a time limit for when Bunge had to make a purchase price adjustment, except for the provision regarding notice within 60 days for inventory adjustment claims.

Moreover, Northern Trust had notice from Bunge that it would be seeking a further purchase price adjustment upon determination of the Ralston claim. Bunge clearly reserved its right to seek a purchase price adjustment, even after the final payment, through its correspondence with the final payment. Northern Trust never contested this claim and accepted the payment with this condition. It was only after the money was received that it raised the issue that there could be no further purchase price adjustment.

Finally, Northern Trust contends Bunge is not entitled to a purchase price adjustment for a claim or liability that merely arose from a breach of warranty but rather it can only have a purchase price adjustment for a claim or liability that arose from a contract or commitment in breach of a warranty.

Paragraph 3 of the stock purchase agreement is entitled "Adjustment of Purchase Price." The pertinent language of paragraph 3(a) provides:

> "If it should be found that \*\*\* (iii) *there are any liabilities of or claims against the corporation arising out of any contract or ·commitment in breach of the representations or warranties made by the representing sellers in paragraph 6 hereof* except as shall have been reflected or accrued in said financial statements or any contract or commitment entered into by the corporation in violation of the provisions set forth in paragraph 5 hereof; \*\*\* then, in any and all such events the purchase price for all of the shares of the common stock will be reduced pro rata accordingly on a dollar for dollar basis." (Emphasis added.)

Northern Trust contends Bunge has failed to satisfy the requirements of this clause. It alleges that a simple breach of a warranty is not a reason for a purchase price adjustment under this paragraph, but there must be a liability of or claim against the corporation arising out of any contract or commitment in breach of the warranty. Bunge contends, on the other hand, Northern Trust's interpretation would render many of the other warranties of exhibit C which did not arise from a contract or commitment (such as the representation that the corporation had paid all of its taxes, that it was a duly organized and validly existing corporation and the financial statements were prepared in accordance with generally accepted counseling principles) remediless and, therefore, meaningless. Bunge contends the trial court simply construed the contract in a commonsense way which gives meaning to all of the provisions contained therein.

The trial court concluded:

> "The Defendant argues that whatever liability existed in this case did not arise from a contract or commitment due to a breach of warranty. It should first be noted that Paragraph 3(a)(iii) not only refers to liability but also claims against Lauhoff. The same paragraph does refer to a "contract or a commitment" but does not preclude relief for the seller's breach of warranty. In Exhibit C to the Stock Purchase Agreement, the Sellers made representations which did not arise from a contract or commitment. As an example, the Sellers represented that all taxes had been paid. The court does not believe that the parties intended to exclude breaches of that type of warranty from Paragraph 3(a)(iii)'s remedy provisions.

The 'contract or commitment' language is broad enough to include liabilities for which Northern would have been responsible, should the claim or liability have presented itself before the agreement was signed. This would include Lauhoff's liability to Ralston, which arose from a commitment or obligation to pay Ralston a license fee which existed as of closing.

The very essence of the warranties would be defeated, and the intent of the Agreement would be negated, if Buyers were not permitted to adjust the purchase price when facts later surfaced evidencing that the value of the business was considerably less than what was represented. The argument that this would leave Sellers liable *ad infinitum* is without merit since there are statutes of limitations which apply."

Section 3(a)(iii) requires that the liability of or claim against Lauhoff arise out of a contract or commitment in breach of a warranty or representation made in exhibit C. Lauhoff had a commitment from ADM to produce TVP, through the granting of a license. However, that commitment was insufficient to protect Lauhoff because Lauhoff needed a license from Ralston to avoid infringing upon Ralston's patent. Thus, since the license from ADM fell short of insulating Lauhoff from liability to Ralston, there was "a liability of and claim against Lauhoff arising out of a commitment in breach of warranty [(*l*)]." Bunge was entitled to a purchase price adjustment under paragraph 3(a)(iii).

## II. WAS THE SETTLEMENT MADE IN GOOD FAITH?

■ Finally, Northern Trust asserts, as an alternative argument to that concerning the language and structure of the stock purchase agreement, that Bunge is not entitled to a purchase price adjustment because the 1986 settlement with Ralston was not made in reasonable anticipation of liability. Northern Trust argues that the settlement was not made in good faith, *i.e.*, in reasonable anticipation of liability, because Bunge knew or should have known that Ralston procured its patent by committing fraud against the United States Patent and Trademark Office. Northern Trust contends Bunge had this knowledge through its awareness of the existence of certain documents and records of Ralston, which Bunge knew about because Far-Mar-Co had attempted to discover those documents during its litigation with Ralston, which Lauhoff and Bunge monitored. Northern Trust also suggests Bunge believed this fraud defense was well grounded in fact because it pleaded it as an affirmative defense after Ralston sued Lauhoff.

Bunge counters that it did not have knowledge of the information in those documents. Far-Mar-Co had moved to compel the production of those documents but its motion to compel was denied by the trial court, based on Ralston's claim of privilege. Bunge did not know what was in those documents nor could it know that another court would allow those documents to be discovered, as did the court in the *Staley* case. As to this issue, the trial court concluded:

"Warranty [(*l*)] covers the use of a patent or process. While the *Staley* case says that Ralston's patent was a nullity, that finding only takes effect when a court announces it. That does not necessarily mean that the settlement made prior to the ruling was not entered into in good faith. While Northern Trust had the option of choosing not to participate in the settlement negotiations, they are bound by the settlement unless actual fraud is shown. To find otherwise would mean that Bunge could never have settled their suit with Ralston."

Northern Trust contends it is not trying to undo the settlement agreement but merely wishes to establish that it should not be liable for any portion of the settlement because Bunge did not enter into it in good faith, *i.e.*, in reasonable anticipation of liability. It is not clear that, as Northern Trust suggests, entering into a settlement in good faith means it must be in "reasonable anticipation of liability." The case Northern Trust relies upon for that principle of law (*Nogacz v. Proctor & Gamble Manufacturing Co.* (1975), 37 Ill. App. 3d 636, 347 N.E.2d 112) had to do with implied indemnity claims and the principal defendant's right to proceed both under the third-party action and to effectuate a good-faith settlement in the principal action.

Even if this is the proper standard for determining good faith, it can be argued that Bunge did in fact settle in reasonable anticipation of liability. Ralston had already been successful in its lawsuit against Far-Mar-Co for patent infringement. It was undisputed that the process used by Lauhoff was the identical process used by Far-Mar-Co, which was found to have infringed upon Ralston's patent. Furthermore, as noted above, Far-Mar-Co's attempt to discover the documents which would allegedly prove the fraud conducted upon the patent office had been rejected by the court in that litigation. There was no reason for Bunge to assume that it too would not have been faced with the denial of a motion to produce these documents and thus defeat its fraud claim. It had no way of knowing that the court in *Staley* would uphold the discoverability of those documents and allow such a defense to be pleaded. Thus, Bunge certainly could reasonably have believed it would be liable to Ralston for the patent infringement;

thus, its settlement was made in good faith because it was in reasonable anticipation of liability.

Illinois public policy favors peaceful and voluntary resolutions of claims through settlement agreements; to establish the invalidity of such an agreement, clear and convincing evidence is required. The Illinois Supreme Court has stated that when considering whether an agreement was made in good faith, the entire circumstances surrounding the settlement must be taken into account. Courts therefore have refused to place great emphasis on any single factor as being determinative of good faith. A settlement may be considered made in good faith when no tortious or wrongful conduct on the part of the settling party has been shown. (*Jachera v. Blake-Lamb Funeral Homes, Inc.* (1989), 189 Ill. App. 3d 281, 285-86, 545 N.E.2d 314, 317.) Challenges to good-faith settlements have been based upon (1) the ratio of the amount of the settlement to the eventual jury verdict; (2) that the settlement did not accurately reflect the jury's ultimate apportionment of liability; (3) lack of consideration in the settlement; (4) collusion between the settling parties; and (5) the absence of meaningful discovery prior to settlement. (*Jachera*, 189 Ill. App. 3d at 286, 545 N.E.2d at 317-18.) Northern Trust has not asserted any of these other potential challenges to the good-faith settlement by Bunge with Ralston. Even if it did assert such challenges, none appear to be applicable to the facts of this case. Clearly, Bunge had a reasonable belief that it would be liable to Ralston for the patent infringement and thus properly settled the claim.

For the foregoing reasons, the judgment of the circuit court of Vermilion County is affirmed.

Affirmed.

STEIGMANN, P.J., and COOK, J., concur.