**In re PARAGON TRADE BRANDS, INC., Debtor.**

Randall Lambert, Litigation Claims Representative for the Bankruptcy Estate of Paragon Trade Brands, Inc., Plaintiff,

v.

Weyerhaeuser Company, Defendant.

Bankruptcy No. 98–60390.
Adversary No. 99–6470.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Oct. 30, 2002.

John A. Lee, W. Scott Locher, Andrews Kurth LLP, Houston, TX, for Plaintiff Randall Lambert, The Litigation Claims Representative.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION TO STRIKE AND MOTION FOR SUMMARY JUDGMENT

MARGARET H. MURPHY, Bankruptcy Judge.

This adversary proceeding is a breach of contractual warranty case. Randall Lambert, Plaintiff, was appointed as the Litigation Claims Representative for the Chapter 11 estate (the "Estate") of Paragon Trade Brands, Inc. ("Paragon") pursuant to Paragon's confirmed Second Amended Plan of Reorganization[1]. Plaintiff filed this action against Weyerhaeuser Company ("Weyerhaeuser") on behalf of Paragon's Estate to recover damages for Weyerhaeuser's alleged breach of four warranties contained in the contracts by which Weyerhaeuser transferred to Paragon the assets relating to Weyerhaeuser's private label diaper business. The transfer of assets to Paragon was a part of Weyerhaeuser's initial public offering of Paragon's stock.

Before the Court are cross motions for summary judgment (the "Motions"). Plaintiff seeks an order granting partial summary judgment that Weyerhaeuser is liable for breaching the four contractual warranties. Defendant seeks dismissal of Plaintiff's Complaint. Defendant also has filed motions to strike certain summary judgment evidence filed by Plaintiff. The Court has reviewed the parties' motions and briefs, as well as all admissible evidence the parties submitted in support of their Motions. Oral argument was held June 24, 2002, on all the motions. At the conclusion of the hearing, the court announced its ruling granting Plaintiff's motion for summary judgment and denying Defendant's motions.

## I. BACKGROUND AND OVERVIEW

In late 1997, the United States District Court of Delaware (the "Delaware Court") entered judgment against Paragon[2], enjoining it from selling its private label "Ultra" diaper, its primary product, because the diaper utilized a key "inner leg gather" ("ILG") feature that infringed patents of Proctor & Gamble ("P & G"). Paragon was also held liable to pay P & G $178 million in damages for infringement[3]. The judgment prompted Paragon, which then was the largest private label manufacturer of infant diapers in the United States, to file, on January 6, 1998, a petition for reorganization under Chapter 11 of the Bankruptcy Code to protect its assets (the "Chapter 11 Bankruptcy Case").

Weyerhaeuser formed Paragon in 1992 as the vehicle to dispose of the division comprised of its private label infant dispos-

---

1. Paragon's Plan was confirmed by order entered January 13, 2000. *See* JX 468.

2. The judgment and opinion by the Delaware Court are dated December 30, 1997. *See* JX 425. The judgment was entered January 6, 1998.

3. The money judgment is dated May 28, 1998. *See* JX 429. The money judgment was entered postpetition after a consent order was entered by this court modifying the stay for that purpose.

able diaper business through an initial public offering of stock ("IPO"). At closing of the IPO in February 1993, the assets and liabilities associated with Weyerhaeuser's private label diaper division were transferred to Paragon pursuant to an Asset Transfer Agreement ("ATA") and an Intellectual Property Agreement ("IPA"), and Weyerhaeuser concurrently sold 100% of Paragon's stock to new public investors. Weyerhaeuser received $240 million upon closing of the IPO.[4]

At the time of the IPO, Weyerhaeuser's private label diaper business consisted primarily of selling its "Ultra" private label diaper to large retail establishments that would place their retail name on the package and sell the diaper on their shelves at lower prices than the prices of the branded diapers (Luvs, Pampers, and Huggies) marketed by P & G and Kimberly–Clark Corporation ("K–C"). At the time of the IPO, Weyerhaeuser's Ultra diaper contained the ILG feature, which, in layman's terms, is a second, elasticized inner barrier cuff in the diaper that contains effluent and significantly reduces leakage. Reduced leakage is a key attribute consumers desire in an infant diaper; without it, Weyerhaeuser learned, a disposable diaper was not a successful product. Weyerhaeuser had begun production and marketing the Ultra diaper with the new ILG feature in March 1991.

When Weyerhaeuser launched the Ultra diaper using the ILG, profits increased as the connection predicted between utilizing the ILG and sales of Weyerhaeuser's diapers proved true. Tempering the Ultra's success, however, was the prospect of patent infringement lawsuits by the two branded-diaper market leaders, P & G and K–C, for infringement of their ILG patents. These two companies were known to

be aggressive in enforcing their patents: Weyerhaeuser had already suffered a severe loss in the mid–1980s when P & G successfully sued Weyerhaeuser and obtained an injunction preventing Weyerhaeuser from using technology on its private label diaper that infringed another P & G patent. The significant shock to the financial condition of Weyerhaeuser's diaper business resulting from that injunction had reached a critical point in mid 1990.

By the time of the Paragon IPO in early 1993, P & G and K–C had completed litigation between themselves over their respective ILG patents, in which the Federal Circuit ruled that P & G's Lawson patent retained claims to ILG features. In confidential internal memoranda, Weyerhaeuser's patent counsel had acknowledged that those ILG features were used in Weyerhaeuser's Ultra diaper. Thus, Weyerhaeuser was left in the position of indisputably infringing the P & G ILG patents. Moreover, the priority-in-invention findings of Federal Circuit decision, as well as an interference action before the United States Patent & Trademark Office ("PTO") that also was decided before closing of the IPO, meant that K–C's ILG patent would soon be broadened by amendment to encompass all ILGs, including the ILGs used in Weyerhaeuser's Ultra diaper.

Following the Federal Circuit decision, P & G and K–C each demanded that Weyerhaeuser pay royalties of between 2% and 3% of sales for a license to use the ILG feature on Weyerhaeuser's diapers. P & G had made a 3% royalty demand on Weyerhaeuser well before the ILG diaper was launched in March 1991. Prior to closing of the IPO, Weyerhaeuser's patent counsel informed high ranking Weyerhaeu-

---

4. Weyerhaeuser received from Merrill Lynch, an investment concern, $205 million as proceeds from the sale of Paragon stock. Wey-

erhaeuser received $36 million from funds advanced by Chemical Bank to Paragon at closing.

ser executive officers that P & G would likely obtain an injunction against Weyerhaeuser for using the ILG feature, and Weyerhaeuser internally discussed how to limit its liability for infringement damages, including possibly creating a subsidiary company in which to place the diaper business. Weyerhaeuser's General Counsel told the company's auditor, Arthur Andersen, that damages from the threatened P & G infringement action could be "enormous" for Weyerhaeuser.

P & G renewed its demands on Weyerhaeuser in the months before the IPO closing in February 1993. K–C also made demands on Weyerhaeuser in the months before the IPO closed. At the time, the private label diaper business that Weyerhaeuser intended to sell to the public through the IPO had a profit margin of 7%. Paying even a single royalty in the 2%–3% range that P & G and K–C each were demanding would have severely cut the future company's anticipated cash flow, on which the IPO was premised. The Prospectus for the IPO, however, represented to public investors that "the Company [Paragon] believes that any outcome with respect to these matters will have no material adverse effect on its financial position or its results of operations."

Despite the ominous threats from P & G and K–C that Weyerhaeuser did not disclose, the IPO proceeded to close. In the ATA and IPA, Weyerhaeuser gave warranties about the assets and business it was transferring to the newly formed company, Paragon. Post–IPO events, including the injunction prohibiting Paragon from producing its Ultra diaper, demonstrate as a matter of law that Weyerhaeuser breached four of those warranties.

Two of the four warranties are set forth in the ATA. They were made with no qualifications as to Weyerhaeuser's knowledge. They provide, in relevant part:

3.01(d): The Transferred Assets and the services and materials to be provided pursuant to the Related Agreements [includes the IPA] are sufficient to conduct the Business as now being conducted.

3.01(c): [Weyerhaeuser] has, and will transfer to [Paragon] at the Closing, good title to all of the other Assets [all assets other than Real Property] ... free and clear of any and all mortgages, security interests, liens, claims, charges, options and encumbrances of any nature whatsoever, except for minor defects and irregularities in title or encumbrances that do not materially impair the use of any such Assets for the purposes for which they are held.

The other two warranties are contained in the IPA. They were each qualified "to the best of Weyerhaeuser's knowledge":

3.11(ii): Schedules 3.01(a) and 3.01(b) are accurate and complete lists of all Patent Rights and Trademarks, as used in connection with the Business or the Products.

3.11(vii): the Primary Intellectual Property plus Trademarks and Secondary Intellectual Property are adequate for the continuation of the Business as currently conducted.

The motions for summary judgment require this Court to determine whether, under applicable Washington law, which the parties agree governs, each of the warranties should be construed as a matter of law to have only one reasonable meaning; whether a genuine issue of material fact exists that the warranties, as properly construed, were breached; and whether an

indemnity clause in the IPA (Section 4.01) precludes Paragon's breach of warranty claims.

## II. INTERPRETATION OF THE WARRANTIES

■ A warranty is "an absolute undertaking *in praesenti* as well as *in futuro*, against the defect, or for the quantity or quality contemplated by the parties in the subject matter of the contract." *Pac. Power & Light Co. v. White*, 96 Wash. 18, 164 P. 602, 606 (1917). A warranty also has been described as follows:

an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past.

*Lilly Indus., Inc. v. Health–Chem Corp.*, 974 F.Supp. 702, 711 (S.D.Ind.1997). A warranty gives the buyer a recourse against the warrantor if the condition of the property is not as promised, despite any supposed "knowledge" the buyer may have had as to a possible defect. *Klock v. Newbury*, 63 Wash. 153, 114 P. 1032, 1033 (1911) (doctrine of *caveat emptor* does not apply to an express warranty of condition, and noting the absolute nature of an express warranty); *Tacoma Coal Co. v. Bradley*, 2 Wash. 600, 27 P. 454, 455 (1891) (when an express warranty is given, the buyer has a right to assume the product sold is as the seller warrants); *see also* WASH. REV. CODE ANN. § 62A.2–313(1)(a) & cmt. 3 (1995) (no reliance on warranties need be shown in order to weave them into the fabric of the agreement); *Foley v. Smith*, 14 Wash.App. 285, 539 P.2d 874, 878–79 (1975) (buyer's knowledge of potentially superior claim does not bar claim for breach of warranty).

At closing of the IPO, Weyerhaeuser represented, in separate documents, that the warranties in the ATA and IPA were enforceable against Weyerhaeuser in accordance with their terms. SF198, 199.[5] These warranties were important parts of Weyerhaeuser's contracts with Paragon upon which the IPO was based, and the warranties must be given meaning. SF200.

■ The parties agree that, because the ATA and IPA so state, the law of the State of Washington controls interpretation of the warranties. The parties agree that the warranties are not ambiguous. SF1. The parties, however, proffer different interpretations of the warranties and the contracts in which they appear. Washington law governs the evidence that may be considered in interpretation of the warranties and the principles of contract interpretation that should be applied to determine the meaning of the warranties.

---

**5.** Citations to "SF" refer to the numbered factual statements and the evidence Plaintiff submitted in support of that statement contained in Plaintiff's Statement of Undisputed Summary Judgment Facts, which factual statement Weyerhaeuser admitted in its Response. Other citations refer to different portions of the summary judgment record, including (1) exhibits contained in a Joint Appendix of Exhibits, cited herein, and by the parties in their briefs, as "JX" followed by the exhibit number in the Exhibit Appendices submitted jointly by the parties for the Court's consideration on their Summary Judgment Motions, (2) excerpts of admissible and competent deposition testimony the parties jointly submitted in a Joint Appendix of Deposition Testimony and offered as summary judgment evidence by citation to the testimony in the parties' summary judgment papers, and cited herein, as the parties did in their briefs, by the person's name followed by "Dep." and the page(s) of the cited reference, (3) supplements to the Appendices, and (4) excerpts of admissible portions of expert testimony.

## A. Washington Contract Interpretation Law

■ Under Washington law, a court's goal in interpreting the contracts is to ascertain the intention of the parties. *Berg v. Hudesman*, 115 Wash.2d 657, 801 P.2d 222, 226 (1990) (*en banc*). Washington contract law allows the court to consider certain extrinsic evidence of the "context" in which the contract was entered in order to give proper meaning to disputed contract provisions. *Id.* at 228–30. Under this "context rule," the court can consider evidence showing the circumstances surrounding the making of the contract, agreements or negotiations prior to or contemporaneous with the adoption of the writing, subsequent conduct of the parties, the reasonableness of the parties' respective interpretations, and custom and trade usage. *Id.* This evidence is admissible regardless of whether the contract is deemed ambiguous, *unless* it is offered to vary, contradict, or modify the written agreement. *Id.; Hollis v. Garwall, Inc.*, 137 Wash.2d 683, 974 P.2d 836, 843 (1999) (*en banc*).

■ The Supreme Court of Washington has made clear, however, that the "context rule" announced in *Berg v. Hudesman* is not a "revolutionary change in the principles of contract interpretation." *Lynott v. Nat'l Union Fire Ins. Co.*, 123 Wash.2d 678, 871 P.2d 146, 148 (1994) (*en banc*). Washington has continued to follow "an objective manifestation test for contracts, looking to the objective acts or manifestations of the parties rather than the unexpressed subjective intent of any party." *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wash.2d 692, 952 P.2d 590, 594 (1998) (emphasis supplied). Under that test, the courts are directed to " 'impute to a person an intention corresponding to the reasonable meaning of his words and acts.' " *Lynott*, 871 P.2d at 149 (quoting *Dwelley v. Chesterfield*, 560 P.2d

353, 355 (Wash.1977) (*en banc*)). "It is the duty of the court to declare the meaning of what is written, and not what was intended to be written." *Berg*, 801 P.2d at 230.

■ Consequently, it remains true that extrinsic evidence cannot be admitted or considered to add to, subtract from, vary or contradict written contracts that are valid, complete, and unambiguous, and not affected by accident, fraud or mistake, and such evidence cannot be used to import into the writing an intention not expressed therein. *Id.* at 229–30; *Lynott*, 871 P.2d at 149. This is true even of evidence that would otherwise be admissible under the "context rule." *U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wash.2d 565, 919 P.2d 594, 597 (1996) (*en banc*). Moreover, statements of subjective intent or understandings, statements by persons not involved in or who lack personal knowledge of the negotiation of the contract term at issue, and after-the-fact reports describing the transaction or contract given by persons other than the negotiating parties, are inadmissible under Washington law. *Lynott*, 871 P.2d at 150–52.

■ Admissible extrinsic evidence in a contract interpretation case does not include:

- Evidence of a party's unilateral or subjective intent as to the meaning of a contract word or term;
- Evidence that would show an intention independent of the instrument; or
- Evidence that would vary, contradict, or modify the written word.

*Hollis*, 974 P.2d at 843. Thus, after considering the admissible extrinsic evidence, it is the duty of the Court, under Washington law, to declare the meaning of what is written, and not what might have been intended to be written or what a bystander to the contract negotiations might have

"understood" had been written. *U.S. Life Credit Life Ins. Co. v. Williams,* 129 Wash.2d 565, 919 P.2d 594, 597–98 (1996). In at least five important contract cases decided by the Washington Supreme Court[6] in the years following its announcement of the "context rule" in *Berg,* the court has rendered judgment on issues of contract interpretation as a matter of law on the basis of the contract language itself, while disregarding affidavits and other evidence of subjective intent offered by the losing party. *Lynott, supra; U.S. Life Credit Life Ins. Co. v. Williams,* 129 Wash.2d 565, 919 P.2d 594 (1996); *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.,* 134 Wash.2d 692, 952 P.2d 590 (1998); *In re Marriage of Schweitzer,* 132 Wash.2d 318, 937 P.2d 1062 (1997) *(en banc); Hollis, supra.*

■ Much of Weyerhaeuser's testimonial evidence on summary judgment involves statements of belief, recollection, or "understandings" imparted eight years after the IPO closing by persons who either had no personal involvement in the negotiation of the warranties at issue in this case, or could not recall anything about their negotiation. The testimony offered by Weyerhaeuser consisting of statements of subjective intent or "understandings" about the meaning of the contracts is inadmissible because it constitutes evidence of subjective intent or would contradict or vary the terms of the agreements. The Washington Supreme Court has stated, "The subjective intention of the parties is irrelevant":

> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. *If, however, it were proved by twenty*

*bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held,* unless there were some mutual mistake, or something else of the sort.

*City of Everett v. Estate of Sumstad,* 95 Wash.2d 853, 631 P.2d 366, 367 (1981) *(en banc )* (emphasis added) (quoting *Hotchkiss v. Nat'l City Bank,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913)).

■ In determining the proper meaning of the warranties and the effect of Section 4.01 of the IPA on Paragon's recourse against Weyerhaeuser for breach of the warranties, only the admissible extrinsic evidence admissible under Washington law has been considered. For the reasons explained above, the testimony from various witnesses about what the witnesses subjectively intended, believed or understood the contracts to provide has been ignored or given little weight. Moreover, many of the witnesses professed lack of memory or lack of involvement in negotiating or drafting the warranties at issue and, thus, are not competent to provide such testimony, even if it were otherwise admissible. *See Lynott,* 871 P.2d at 150–52.

## B. The Context of the Transaction and Weyerhaeuser's Knowledge

The summary judgment movant must show that no genuine issue as to any material fact exists and that movant is entitled to judgment as a matter of law. Bankruptcy Rule 7056, incorporating Fed. R.Civ.P. 56. Interpretation of a contract is a question of law. *Berg,* 801 P.2d at 229. The following facts are established by the summary judgment record, primarily through Weyerhaeuser's documents. The

---

**6.** Four of those five decisions are *en banc* decisions.

facts are established by admissible, objective evidence of the context of the transaction, and the context in which Weyerhaeuser's warranties were made. Further, these facts are relevant to Plaintiff's claims for breach of the two IPA warranties, which were made to the "best" of Weyerhaeuser's knowledge. The undisputed material facts show that Weyerhaeuser was fully familiar with the patent deficiency that would confront Paragon after closing of the IPO, and that Weyerhaeuser either knew, or had means of knowing, the warranties were not true.

### 1. Weyerhaeuser's Development of Its Diaper Business

Weyerhaeuser was no stranger to the pitfalls of "matching" its branded competitors' patented diaper features. In the early 1980s, Weyerhaeuser had successfully sold private label diapers through its Personal Care Products ("PCP") division, earning profits of up to $38.7 million per year. SF9. Weyerhaeuser's success was due to its brand-matching strategy of copying key innovations of P & G and K–C, and selling its diapers at a discounted price. SF9–11.

■■■ Weyerhaeuser's matching of P & G's patented Buell leg gather feature ("Buell '003") was a key to its early success, and P & G sued Weyerhaeuser for infringing that patent (the "Buell Litigation").[7] SF11–12. The trial court, in a decision published in 1985, rejected Weyerhaeuser's invalidity defenses to the patent,[8] found Weyerhaeuser liable for infringement, and permanently enjoined further infringement. SF14, 16, 17. The injunction had a materially adverse effect on Weyerhaeuser's diaper business (SF20), and profits plummeted.[9]

After Weyerhaeuser's loss of the Buell Litigation, Weyerhaeuser explored various avenues it hoped would rehabilitate the infant diaper division's profitability. In 1986–87, Weyerhaeuser purchased a Johnson & Johnson diaper development project. Weyerhaeuser also commenced the Project Epcot development to develop its own branded diaper. JX16. But by mid–1990, after a three-year effort, Weyerhaeuser abandoned Project Epcot, and took a write-off of more than $100 million. The project was internally considered a financial disaster. SF22.

By mid–1990, after Project Epcot was abandoned, the market for diapers had matured, birth rates were declining, costs were increasing, and P & G and K–C were accelerating the pace of diaper innovations. SF23. Weyerhaeuser projected a record $6 million loss in 1990 for what was considered a "sick" diaper division. *Id.* The management of the PCP division was un-

7. *See* JX2, the decision in *Procter & Gamble Co. v. Weyerhaeuser Co.,* at 227 U.S.P.Q. 786, 1985 WL 72670 (N.D.Ill.1985).

8. *P & G v. Weyerhaeuser,* 227 U.S.P.Q at 793. Patents issued by the Patent and Trademark Office ("PTO") are presumptively valid. 35 U.S.C. § 282 (2001). A party attacking a patent's validity has the burden of overcoming this presumption by clear and convincing evidence. *Finnigan Corp. v. Int'l Trade Comm'n,* 180 F.3d 1354, 1365 (Fed.Cir.1999); Needle Dep. [a Weyerhaeuser expert] at 31–33; JX637 (Gordon V. Smith & Russell L. Parr, Valuation Of Intellectual Property And Intangible Assets 9 (3d ed.2000)).

9. JX16 at WEY 3290, point 4; JX11 at K 10485 (showing private label diaper pretax profits dropping from $31–39 million for 1983–84, to $19.2 million in 1985 (the judgment was entered at mid-year), to $3 million for 1986, a $2.2 million loss in 1987, back up to $9.4 million in 1988, and down to $2 million in 1989); JX12 at WEY 2727 (downward turn in 1985 due in part to "P & G's lawsuit and subsequent victory against Weyerhaeuser on the elastic leg patent infringement"); Cole Dep. 98–99 (change in product caused "a very substantial loss," '83–84 were "the wonderful days").

der pressure to improve financial results. SF25. Weyerhaeuser launched an internal refocusing study and hired a consultant to advise it how to reverse the deteriorating situation. SF24. The ultimate conclusion was to refocus on a private label product and to improve the quality of Weyerhaeuser's "Ultra" private label diaper, which lagged significantly behind the quality of P & G's and K–C's diapers. SF 24, 26.

To return successfully to the private label business, Weyerhaeuser knew its private label diaper would have to match the key quality features that the branded manufacturers, P & G and K–C, incorporated into their diapers, which by 1990 included the key ILG feature. SF27. Weyerhaeuser knew that (1) incorporating this ILG feature into its private label diaper would improve the quality of its diaper because it reduced leakage; (2) no other alternative to the ILG feature was feasible; (3) the ILG feature would help Weyerhaeuser take a major step in narrowing the quality differential between its diaper and the national brands (P & G and K–C); (4) implementing the ILG feature was essential for Weyerhaeuser to remain a viable player in the diaper market; and (5) failure to adopt the feature would negatively impact future sales. SF29. The ILG feature was critical to the future success of Weyerhaeuser's baby diaper business, and Weyerhaeuser knew it. SF29, 44.

Weyerhaeuser ultimately launched its ILG diaper in March 1991. SF48. The diaper was a huge success, and narrowed the quality gap between Weyerhaeuser's private label diaper and the branded diapers. *Id.* For almost one year before the ILG diaper was launched, Weyerhaeuser had negotiated with P & G to obtain a license to use its ILG technology,[10] offering on many occasions to pay royalties or to trade licenses to various Weyerhaeuser patents for the right to use the ILG feature. SF45. P & G, however, would not agree to a royalty-free cross license, and demanded a 3% royalty. SF46. Weyerhaeuser refused that royalty demand, and proceeded to sell ILG diapers with no license from P & G. SF 47, 48, 53.

Also in March 1991, Weyerhaeuser commenced efforts to evaluate selling its baby diaper business. SF51. In May 1991, as part of Weyerhaeuser's internal assessment of the business, Pat Coogan, an in-house Weyerhaeuser patent lawyer who had studied P & G's Lawson ILG patent and K–C's Enloe ILG patent, advised Weyerhaeuser's Investment Evaluation Department ("IED") that:

(a) "Weyerhaeuser had just recently started production of a diaper [that had] in general the same combination of inner and outer cuff members [as provided in P & G's and K–C's Lawson and Enloe patents],"

(b) That despite the defensive patent opinions from outside counsel that Lawson and Enloe were invalid, the party who prevailed in the Seattle litigation between P & G and K–C was likely to obtain a preliminary injunction against Weyerhaeuser precluding it from using the ILG feature, and

(c) Weyerhaeuser had a 70% chance that it would be able to establish the patents were invalid or *"at least"*

10. P & G's Lawson patent made claims to ILGs made of "impermeable" or hydrophobic materials. K–C's Enloe patent, as it originally issued, made claims to ILGs composed of fluid "pervious" materials, and accordingly was less of an immediate concern to Weyer- haeuser given its impermeable ILG design. However, for reasons described subsequently in this Order and described in Weyerhaeuser's documents (*e.g.*, JX39), as events unfolded, K–C's Enloe patent would also present an infringement problem.

*that the infringement was not willful.*

JX24; Coogan Dep. 135–39, 141–42.

Weyerhaeuser nonetheless continued to produce and sell the ILG diaper without a license from P & G or from K–C for use of the technology. SF48–49. Sales grew from around $250 million in 1990 to over $450 million in 1993, and the bottom line improved from a loss of $6 million in 1990 to a $45 million profit in 1992–93, all as a substantial result of the ILG diaper. SF50.

Weyerhaeuser's evaluation of selling its diaper business continued through August 1991. SF60. Morgan Stanley delivered an assessment that the PCP business could not be sold for much more than its $80 million book value. JX36.[11] Weyerhaeuser then turned to its long-time banker, Chemical Bank, which advised that the "[i]nfant [diaper business] may not be saleable at anything better than a fire sale price." SF62.

### 2. Weyerhaeuser's Patent Risks Continue to Mount

As Weyerhaeuser continued to sell the ILG diapers through 1991 without a license, its exposure to claims of patent infringement grew. Several internal Wey-

erhaeuser meetings and communications took place that demonstrate conscious awareness by Weyerhaeuser senior management of the gravity of the infringement predicament, as Weyerhaeuser continued to search for ways to dispose of the diaper business. For example, on August 20, 1991, Pat Coogan met with Mr. Robert Dowdy (another Weyerhaeuser in-house attorney, who later became the project manager for the Paragon IPO) and two Weyerhaeuser IED officers to discuss the baby diaper division. The notes from that meeting (JX600) demonstrate that Weyerhaeuser knew that the ILG infringement risk, including the risk of lost profit damages, was so great that it should consider transferring the baby diaper business into a separate subsidiary to protect Weyerhaeuser.[12]

Notes from a September 5, 1991, meeting Mr. Coogan had with Weyerhaeuser's then-General Counsel, Bob Lane, demonstrate that Mr. Lane and Mr. Coogan were both aware of the serious risks Weyerhaeuser faced over the ILG patents.[13] These notes manifest an awareness of all of the risks the diaper division faced from claims of patent infringement, the potential for a substantial lost profits damage award, and that Weyerhaeuser's chances

---

**11.** Morgan Stanley's "Project Sunny" report, at WEY 3340 (describing the difficulties Weyerhaeuser would encounter in selling the infant diaper business), and at WEY 3342 (concluding that the business, in a "base case," would yield $75–85 million).

**12.** JX600 at 2. In discussing the "patent infringement risk" of the PCP division, these notes, which were of a meeting among Weyerhaeuser's Hirschey, Imirzian, Dowdy, Coogan and Abraham, reflect, on page 2, their knowledge of "recent case law becoming stricter in terms of damage claims—*e.g.,* lost sales, lost profits, costs of discounting." "Damage claim downside is great, so how to limit our downside? Set up as a separate sub?" *See also* Coogan Dep. 147–50.

**13.** *See* JX37, Mr. Coogan's notes of his September 5, 1991 "Patents 101" meeting with Bob Lane. Page 1 describes potential damages to include "lost profits" and an "injunction." Page 2 explains, among other things, the doctrine of equivalents, that on the "Inner Gather" infringement "one claim [would be] willful [Dragoo]", and gives the example of the "Polaroid/Kodak $908,000,000" patent award. Page 3 recites that damages would be "not less than a reasonable royalty; not more than lost profits of patent owner," that the "likelihood of success vs. the prior art" on the Lawson/Enloe ILG claims was only "50/50," and that Weyerhaeuser had no defense to willful infringement of Dragoo. *See also* Coogan Dep. 154–63; Lane Dep. 53–59.

of prevailing on its invalidity defense to P & G's Lawson patent were no better than 50/50.

The extent of Weyerhaeuser's risk from the P & G ILG patent problem was affected by the then-pending litigation between P & G and K–C over their respective ILG patents. Mr. Coogan followed the litigation closely. SF58. If that litigation resulted in a decision that K–C's Enloe patent had priority in invention over Lawson, Lawson might be invalidated, and the infringement risk would have been ameliorated, at least for the time being. But on September 10, 1991, the trial court decision in that litigation issued. It held that, while K–C's Enloe "fluid pervious" ILG patent had priority over Lawson, Lawson's claims to an impermeable ILG were not invalidated by Enloe.[14]

Three days later, Mr. Coogan sent a memorandum to Weyerhaeuser's CEO, CFO, and its Executive Vice–President, three of its highest ranking officers, explaining the situation. SF68. First, Mr. Coogan told them the Lawson claims were not invalidated as hoped, leaving Weyerhaeuser exposed to claims it infringed P & G's patent. SF69. Second, Mr. Coogan explained that because K–C was awarded invention priority, it would "likely" prevail in its pending interference action before the PTO to obtain an amendment to Enloe, broadening its claims to include all ILGs. SF70. This meant that for Weyerhaeuser to ameliorate its infringement risk, it would have to license the ILG technology from not just one, but two major competitors. Mr. Coogan accordingly advised these senior executive officers that Weyerhaeuser's "infringement risk exists now and continues for all of our inner gather production." SF74. Therefore, on September 13, 1991, Weyerhaeuser unquestion-

ably knew that the P & G *and* K–C patent infringement risks were solid and present risks with increasingly higher stakes for a continued gamble.

P & G began formally notifying Weyerhaeuser of its infringement of the Lawson and Dragoo ILG patents in December 1991, but Mr. Coogan put P & G off, saying Weyerhaeuser would (1) resolve the Lawson issue after the appeal of the P & G/K–C priority litigation was decided; and (2) change its product to avoid Dragoo; however, Weyerhaeuser later did neither. SF75–76. Bob Lane then met with Weyerhaeuser's auditor over Weyerhaeuser's year-end 1991 audit (JX605, meeting notes), and advised the auditors that if P & G won the threatened ILG infringement case, the damages would be "enormous."[15] Mr. Lane followed up this meeting with a written 1991 year-end audit response, disclosing potential damages for ILG patent infringement of 3% of sales and an injunction, and continued making this same disclosure until April 1992. SF80–81. During the period May 1991 through March 1992, before the IPO underwriting (described hereafter) began, Weyerhaeuser representatives knew and fully appreciated the infringement risk the diaper division faced. During the underwriting described in the following section, the risks continued to mount.

### 3. Events Relating to the IPO and Drafting History of the Agreements

Of all the methods available to put corporate distance between Weyerhaeuser and the subsidiary-to-be, Weyerhaeuser chose the method which put the most distance between it and the baby diaper business:

---

14. JX38 at 14–15.

15. JX1001 and JX605, which is a more legible copy of the last page of JX1001; Morgan Dep. 12–16, 20.

(1) Weyerhaeuser could have created Paragon as a subsidiary and retained all the stock of Paragon;

(2) Weyerhaeuser could have sold less than 50% of Paragon's stock and retained more than 50%;

(3) Weyerhaeuser could have sold more than 50% of Paragon's stock but retained control (5%—20% may be enough for control);

(4) Weyerhaeuser could have sold more than 80–95% of the subsidiary's stock but retained such amount as might be considered neither control nor an influence in Paragon's business; or

(5) Weyerhaeuser could have sold all of Paragon's stock, retaining no ongoing interest.

Weyerhaeuser was first presented with a remunerative means to sell the baby diaper business in March 1992, when representatives of Merrill Lynch ("Merrill") suggested to Weyerhaeuser that it could raise $140 million or more by selling the baby diaper business to public investors through an IPO. SF110. Weyerhaeuser engaged Merrill to underwrite the IPO, and Merrill hired the Skadden Arps ("Skadden") law firm to serve as underwriter's counsel. SF111. Weyerhaeuser hired the Paul Weiss firm to represent it and Paragon, its to-be-formed subsidiary [16] whose stock would then be sold to the public. *Id.*

When Paragon was formed as a legal entity in early July 1992, Paul Weiss began representing not only Weyerhaeuser, the seller under the ATA and IPA, but also Paragon, the buyer. SF 141. Until closing of the IPO, the baby diaper business continued to be conducted through Weyerhaeuser, and all "Paragon-to-be" officers were employed by Weyerhaeuser, paid by Weyerhaeuser, and under Weyerhaeuser's direction and control. SF 135, 138.

Because it had previously operated the diaper business as an internal division, the IPO agenda was for Weyerhaeuser to form a new company to which the diaper business would be transferred. SF114. The new company's stock would be sold to the public by Weyerhaeuser through Merrill, with the proceeds of the stock going to Weyerhaeuser. SF114. The transaction represented a 100% sale of the business for cash to new investors, with Weyerhaeuser retaining none of the stock.

As the underwriting progressed, the underwriter conducted due diligence on the Weyerhaeuser baby diaper business. SF151. Drafts of the ATA and IPA were prepared and revised at various times before closing, including revisions by which the warranties at issue were added. Most of the witnesses whose deposition testimony is in the record testified that they did not recall the details of various revisions made to the documents, including the negotiation and addition of the warranties at issue.

From April through June 1992, Merrill and Paul Weiss representatives focused on drafting the S–1 Registration Statement, while Weyerhaeuser in-house lawyers, Sandy McDade and Mr. Coogan, focused on drafting the contracts (including the ATA and IPA) by which the assets of Weyerhaeuser's baby diaper business would be transferred to the newly-formed company, whose stock would concurrently be sold to the public at closing of the transaction. SF115. The addition of the warranties to the ATA and IPA can be tracked, however, through a series of drafts, each of which is dated by a footer that appears on the document. SF117. Although this evidence is informative, the

16. The subsidiary to be formed was referred to in early IPO drafts as "Seedling."

plain language of the agreements that were actually executed by the parties ultimately controls. Regardless of exactly how the sufficiency of asset warranties came to be added, the warranties *were* added to the IPA and ATA and became parts of those contracts. They were accepted by Weyerhaeuser, and Weyerhaeuser promised they were true and enforceable on their terms as a condition of closing of the IPO.

The initial drafts of the ATA and IPA that circulated May 16, 1992, to the underwriter and its counsel contained no warranties at all by Weyerhaeuser, as seller, to the newly-formed company, which was later incorporated as Paragon. SF123. By June 1992, three seller warranties were added to the ATA, including the good title warranty in Section 3.01(c). SF124. The Section 3.01(d) sufficiency of assets warranty did not appear in this draft. *Id.* In the June 5, 1992 draft IPA, Weyerhaeuser had added a Section 4.01 providing for Paragon to indemnify Weyerhaeuser from certain intellectual property liabilities, but that draft had no warranties at all in favor of Paragon. SF126.

In June 1992, just before Weyerhaeuser filed its initial S–1 with the SEC, in a meeting with Weyerhaeuser's auditors and Mr. Lane, Mr. Coogan advised the auditors for Weyerhaeuser that the ILG infringement claims were "probable of assertion" and a "reasonable possibility of a loss" existed that could include treble damages and an injunction. SF90. After extensive drafting work, a draft S–1 registration statement was filed with the SEC on or about July 7, 1992. SF128. This draft

stated that the patent risk from Paragon's not having licenses to the Enloe and Lawson ILG technology would have no material adverse effect on the "current" condition of the Company, but gave no assurance as to the future outcome. SF161. At this point, the operating profit margin of Weyerhaeuser's baby diaper division, soon to become Paragon, was around 7%. SF178. A single 2% royalty would have equaled almost 30% of Paragon's 7% profit margin. SF189. Payment of royalties in this range probably would have destroyed any prospect of completing the IPO.[17]

After the initial draft S–1 was filed in July, the parties progressed through due diligence and continued negotiating the "material" contracts[18] that would be publicly filed (by later amendment) with the SEC as part of the IPO. The IPA had not been filed with the SEC at this point. *See* SF129; JX176 at II–2 (WEY 1758). A July 21, 1992 draft of the IPA shows that no warranties were in the IPA at that point. JX812.

On August 5, 1992, the SEC objected to the proposed disclosure of patent risks set forth in the S–1 filed on July 7, 1992, stating that in light of the fact that investors are concerned with the future performance of the company-to-be, the risk disclosure was inadequate. SF162. On August 11, 1992, an August 10, 1992 draft of the IPA was filed with the SEC, as part of Amendment No. 1 to the S–1 filing. SF164. This document, which was the first draft of the IPA filed with the SEC, shows that six warranties were added to the IPA. SF164. These six warranties are

---

**17.** Cole Dep. 76 (disclosure alone would have been a "disaster" for the IPO); Bickell Dep. 45–47; Abraham Dep. 190–94 (would have "spooked" the investors; 2% was one-third of the profit margin; even a single 2% royalty would have killed the IPO). Merrill's Scott Ryles, the lead investment banker on the transaction, testified there would not have

been an IPO with a 4% royalty payable. Ryles Dep. 120–21.

**18.** The federal law that governed the IPO required the ATA and IPA, as "material" contracts, to be publicly filed as part of the final Registration Statement. 15 U.S.C. §§ 77aa(24), (30) (1997).

substantially the same warranties that appear as the Section 3.11(i-vi) warranties in the final IPA. The IPA Section 3.11(vii) warranty does not appear in this draft. In the next draft IPA, with a footer dated August 14, 1992, IPA Section 3.12 had been renumbered 3.11, and a seventh seller warranty was added, which was the predecessor for IPA Section 3.11(vii). SF169; JX551. This warranty then provided that to the best of Weyerhaeuser's knowledge "the Primary Intellectual Property plus Trademarks and Secondary Intellectual Property are adequate for the continuation of the Business." JX551.

Mr. Coogan had hoped that despite its having survived intact at trial, the Lawson ILG patent might be invalidated by the Federal Circuit in K–C's and P & G's cross appeals of the decision in the Seattle litigation. On August 26, 1992, however, the Federal Circuit affirmed the trial court decision, leaving P & G's Lawson patent with valid claims to impermeable ILGs.[19] Also in August, the PTO decided an interference action over the ILG invention in favor of Enloe. SF86. Accordingly, no genuine dispute exists that Mr. Coogan knew Enloe would thereafter be amended to encompass ILGs made of any material. SF87. Soon not just one, but two competitors would be holding patent rights to the ILG feature that Weyerhaeuser was using.

The IPO was tabled in early September 1992. The publicly stated reason was concerns over the effect of a P & G reduction in the price of its branded diapers on Paragon's already narrow profit margin. SF179. By late fall, however, the IPO was

back on, and proceeding to a closing in early 1993. SF180.

Even though Mr. Coogan had told P & G as recently as March 1992 he would address its royalty demands once the Federal Circuit ruled, after the decision issued, Mr. Coogan sought instead, in November 1992, as he had in 1991, to convince P & G to accept a license of Weyerhaeuser's patents in return for Weyerhaeuser's right to use the Lawson and Dragoo ILG technology. SF94.[20] P & G never reduced its 3% royalty demand. Mr. Coogan offered to make the same trade with K–C for Enloe ILG patent rights.[21] Later in November, after K–C prevailed in lawsuits against two competitors for infringing Enloe, K–C demanded that Weyerhaeuser pay royalties of 3% for Enloe. SF99. Two in-person negotiating sessions were unsuccessful, as K–C also had no interest in cross-licensing any of Weyerhaeuser's patents. SF100–01. At the end of December 1992, K–C sent Weyerhaeuser a final demand letter "[i]n the interest of settling this matter and avoiding litigation," demanding a royalty of 2.5% on the first $500 million of Weyerhaeuser ILG diaper sales for 7½ years in exchange for a license under its Enloe patent and the to-be-issued amended Enloe patent encompassing all ILGs. SF103.

On December 23, 1992, Weyerhaeuser's McDade circulated a draft of the ATA, which contained no Section 3.01(d) warranty. SF181. From the following facts, it cannot be disputed that the ATA 3.01(d) warranty was added to the ATA sometime

---

**19.** *See* JX227, decision of the Federal Circuit Court of Appeals in *Kimberly–Clark Corp. v. The Procter & Gamble Distributing Co., Inc., et al.,* 23 U.S.P.Q.2d 1921, 973 F.2d 911 (Fed. Cir.1992), affirming the trial court decision as to priority, but vacating non-infringement findings as moot pursuant to the parties' settlement.

**20.** *See* JX250, a November 13, 1992 Coogan letter to P & G (offering inventory of Weyerhaeuser diaper patents in exchange for Lawson/Dragoo rights).

**21.** *See* JX249, a November 10, 1992 Coogan letter to K–C (offering cross-licenses).

between December 23, 1992 and January 22, 1993. On January 12–13, 1993, a pre-closing of the ATA occurred at Weyerhaeuser's headquarters in Seattle. SF182. It was attended by Jonathan Grunzweig of Skadden, Weyerhaeuser's McDade, and Messrs. Janover and Lange of Paul Weiss. *Id.* Mr. Abraham, the other key Paragon managers, and the Merrill bankers were in Europe attending the IPO roadshow at the time.[22] *Id.* Although he was Project Manager for the IPO, Weyerhaeuser's Mr. Dowdy was in New Zealand at the time of the January 12–13 pre-closing. *Id.* Mr. Dowdy left Mr. Coogan in charge of the IPO project in his absence. Dowdy Dep. 156–57. The closing documents were revised at the pre-closing.[23] An IPA draft dated January 12, 1993, the first day of the pre-closing, added the phrase "as currently conducted" to the end of the IPA Section 3.11(vii) warranty. The January 22, 1993 draft ATA filed with the SEC as an Exhibit to Amendment No. 5 to the S–1 contains the Section 3.01(d) warranty, which is similar to the IPA 3.11(vii) warranty. SF186; JX328.

Mr. Coogan sent K–C a response to its last demand in late January, just days before the IPO closed on February 2, 1993, putting K–C off, stating that he had a "training class" commitment the week of the IPO closing. SF104. P & G's last license demand for Lawson/Dragoo rights was the 3% royalty reflected in Mr. Lane's 1992 audit response to Arthur Andersen. SF98. K–C's final demand was for a 2½%,

7½-year royalty. SF105. Weyerhaeuser accepted neither, counteroffered nothing to either P & G or K–C, disclosed neither demand, but closed the IPO.

Weyerhaeuser had tried since 1991 to find an alternative, non-infringing design to the ILG diaper, with no success. SF106. When the IPO closed, Weyerhaeuser/Paragon had no alternative product design to which to retreat. The royalty rates P & G and K–C demanded before closing were not disclosed in the final Prospectus, nor was the anticipated effect of an injunction or other possible consequences: lost sales, lost profits, costs of discounting and, at least, royalties. Instead, the final version of the S–1 Registration Statement represented, in at least three separate places, that the Company believed "any outcome" of P & G's and K–C's ILG patent claims would "have no material adverse effect on [Paragon's] financial position or its results of operation."[24] Weyerhaeuser actually, and undisputedly. *well* knew better. This representation is consistent with interpreting the warranties to mean that the intellectual property assets Paragon was receiving were sufficient to conduct the ILG diaper business.

Other evidence shows that Weyerhaeuser was familiar with sufficiency of assets warranties because they had appeared in various other documents in connection with the transaction and in connection with other Weyerhaeuser diaper business

22. The "roadshow" for the Paragon IPO took place during the three weeks before the IPO closing. Paragon's CEO, COO and CFO, and representatives from Merrill Lynch traveled to various cities in Europe to conduct investor presentations. JX 300, 1029; Ryles dep. 43.

23. JX369 at 17; JX368 at 55–56; Quigley Dep. 111–14, 116–18; Janover Dep. 114–26.

24. Weyerhaeuser has repeatedly cited to a certain disclosure made in footnote 10 to the

financial statements attached as exhibits to the Prospectus (page F–15). This disclosure was the same disclosure the SEC had rejected in the August 5, 1992 comment letter. JX 193 at 2. After this disclosure was rejected, the body of the prospectus was revised, in several places, to make the disclosure that management believed "any outcome" of the ILG patent claims "will have no material adverse effect on [Paragon's] financial position or its results of operation."

sale and purchase documents. Approximately 40 days before the IPA Section 3.11(vii) sufficiency of assets warranty was added, Skadden had negotiated the addition of a sufficiency of assets warranty to the underwriting agreement. SF173. A sufficiency of assets warranty also appeared in the contract whereby Weyerhaeuser purchased assets relating to a diaper development project from Johnson & Johnson. SF175; JX3. In or around April of 1992, while the early drafts of the IPO documents were being prepared, another provision of this nature appeared in the contract by which Weyerhaeuser sold the assets of its adult diaper division to Scott Health Care. SF176; JX53. In that contract, Weyerhaeuser, as seller, warranted that "[t]he Purchased Assets, together with the Facility, constitute all of the assets held for use or used by Seller [Weyerhaeuser] in the Business as presently conducted, and such assets are adequate to carry on the Business as presently conducted." *Id.*

### 4. Paragon Files Its Bankruptcy Petition

The IPO closed February 2, 1993,[25] with Paragon having no licenses to use the ILG feature on its principal product, the private label baby diaper. Weyerhaeuser received approximately $240 million at closing for the IPO of its baby diaper business. SF201.[26] For Weyerhaeuser, the IPO was a "fabulous success." SF202.

After the IPO, Mr. Coogan continued to act as a diaper patent advisor to Paragon for about three years, as contemplated by

Sections 3.06(b) of the IPA and 5.02 of the ATA (SF207), and Paragon's representatives relied on Mr. Coogan.[27] Paragon had no greater success designing around the ILG patents after the closing than Weyerhaeuser had prior to closing. SF209. Further negotiations between Paragon and P & G in the year after the IPO closing were unsuccessful. P & G would accept nothing less than a 2% royalty for ILG patent license rights. SF210. For Paragon to agree to pay such a royalty, however, would have been inconsistent with the representation of management's belief in the Prospectus that "any outcome" of the ILG issue would have "no material adverse effect" on the business, because an agreement to pay such royalties would have eliminated 30% of Paragon's profit margin.

On January 20, 1994, approximately one year after the IPO, P & G sued Paragon for infringing its Lawson and Dragoo patents. SF217. On October 26, 1995, K–C sued Paragon for infringement of its Enloe ILG patents. SF226. Just as Mr. Coogan anticipated, on February 4, 1997, Enloe was broadened by amendment to encompass all ILGs, whether impermeable or fluid pervious. SF227. The P & G case against Paragon went to trial first, in Delaware in mid–1997. In a 200–page opinion,[28] the Delaware Court held that the Weyerhaeuser Ultra diaper launched in early 1991, which Paragon continued to sell after the IPO,[29] infringed on P & G's Lawson and Dragoo patents. SF219. The Delaware Court (1) rejected Paragon's invalidity defense, (2) found that Paragon's 97% impermeable ILG infringed Lawson's

---

**25.** The final SEC Registration Statement was filed January 25, 1993.

**26.** *See* footnote 4, above.

**27.** Abraham Dep. 41 (told every Paragon general counsel to consult with Mr. Coogan). 204–06 (heavy reliance on Mr. Coogan after IPO), 230–31 (reliance through mid-'96).

**28.** *Procter & Gamble Company v. Paragon Trade Brands, Inc.,* 989 F.Supp. 547 (D.Del. 1997). A copy of the opinion may be found at JX 425.

**29.** For infringement purposes, Paragon's ILG diaper did not change from Weyerhaeuser's design. SF218.

claim to "impermeable" ILGs, both literally and under the doctrine of equivalents, (3) awarded lost profits damages, on top of a 2% royalty, and (4) found willful infringement of Dragoo. SF220. As a result of the judgment entered January 6, 1998, Paragon filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. On or about May 28, 1998, the Delaware Court entered a money judgment of $178 million and a judgment permanently enjoining Paragon from making its key product.[30] SF222. The filing of Paragon's bankruptcy petition stayed the K–C litigation before it too could go to trial. SF223, 228.

During its bankruptcy case, after extended hearings in the Spring and Summer of 1999, Paragon settled with P & G, granting P & G a $158.5 million unsecured claim and a $5 million administrative claim, and licensing the Lawson and Dragoo ILG technology in return for a 2% royalty.[31] Paragon also settled with K–C regarding Enloe, granting a $110 million unsecured claim for infringement of Enloe dating back to 1991, and a $5 million administrative claim, and licensing the Enloe patents for a royalty in excess of 2%. The necessity of the settlements and license agreements for Paragon to continue conducting its diaper business was fully and fairly litigated. On August 6, 1999, orders were entered approving the P & G and K–C settlements and licenses, finding each was reasonable and necessary. See JX 455 and 456. The settlements and licenses were ultimately incorporated in Paragon's Chapter 11 Plan (JX 468) and the Confirmation Order (JX 469), both of which reaffirmed that the agreements were reasonable and necessary.

## III. THE WARRANTIES SHOULD BE INTERPRETED AS A MATTER OF LAW

### A. The "Sufficiency of Assets" Warranties

■ Under Washington law, interpretation of a contract provision is a question of law when it does not depend on the use of extrinsic evidence or when only one reasonable inference can be drawn from that evidence. *Tanner Elec. Coop. v. Puget Sound Power & Light Co.*, 128 Wash.2d 656, 911 P.2d 1301, 1310 (1996) (*en banc*); *Martinez v. Miller Indus., Inc.*, 94 Wash. App. 935, 974 P.2d 1261, 1266 (1999). If, after considering the language of the contract and admissible evidence concerning the context of its formation, only one reasonable meaning can be ascribed to the agreement, then that meaning reflects the parties' intent as a matter of law. *Martinez*, 974 P.2d at 1266. The words used in the contract should be given their plain and ordinary meaning, and they do not become ambiguous merely because the parties suggest different meanings. *Id.* " 'Ambiguity will not be read into a contract where it can reasonably be avoided.' " *Id.* (quoting *McGary v. Westlake Investors*, 99 Wash.2d 280, 661 P.2d 971, 974 (1983) (*en banc* )).

---

**30.** Post petition, May 28, 1998, after entry of a consent order modifying the automatic stay, the Delaware Court entered a money judgment of $178 million and permanently enjoined Paragon from making its key product.

**31.** The court takes judicial notice of all the pleadings, documents and other papers filed in connection with Debtor's main bankruptcy case, as well as all the testimony and argument received at the various hearings in that case, including the extensive hearings held on Debtor's motions to approve the settlements with P & G and K–C. Much of the evidence at the hearings centered on the substance of the patent issues. Copies of the orders entered on Paragon's settlements with P & G and with K–C may be found at JX455 and JX 456 respectively.

Neither party in this case contends that the warranty language is ambiguous. Even if the warranties were ambiguous, however, Washington law would require any ambiguity to be resolved against Weyerhaeuser, the drafter of the agreements. Each of the warranties has only one reasonable interpretation and is not ambiguous. The subjective beliefs and understandings of Weyerhaeuser's witnesses about what, in hindsight, was the intended meaning and purpose of the warranties does not create an ambiguity and cannot support an interpretation of the warranties which varies from their plain meaning. *Berg*, 801 P.2d at 233.

The ATA Section 3.01(d) sufficiency of assets warranty was made with no qualifications as to Weyerhaeuser's knowledge. It provides:

> The Transferred Assets and the services and materials to be provided pursuant to the Related Agreements [includes the IPA] are sufficient to conduct the Business as now being conducted.

The IPA Section 3.11(vii) sufficiency of assets warranty, which was specific as to intellectual property, provides that "to the best of Weyerhaeuser's knowledge..."

> the Primary Intellectual Property plus Trademarks and Secondary Intellectual Property are adequate for the continuation of the Business as currently conducted.

The meaning and intent of these two warranties are that Weyerhaeuser warranted to Paragon that, in the case of the ATA, the Transferred Assets (the collective universe of all assets sold), and in the case of the IPA, the transferred intellectual property, were all that was legally required for Paragon to continue to manufacture and sell the same diaper products Weyerhaeuser was selling at the time of the IPO. These products consisted primar-

ily of private label baby diapers containing the ILG feature.

Weyerhaeuser contends the sufficiency of assets warranties should be interpreted to be warranties by Weyerhaeuser that "what is being transferred by it constitutes all the assets and intellectual property Weyerhaeuser used in the business at the time of the IPO, with all faults, claims and encumbrances." Defendant's Brief at 34. Weyerhaeuser's interpretation for these sufficiency of assets warranties, however, is contrary to the language of the warranties, and is not reasonable considering the contracts as a whole.

The plain language of the warranties describes the assets as "adequate" and "sufficient" for Paragon to continue conducting business as it was conducted at the time of the IPO. At the time of the IPO, however, the business was using technology patented by P & G and K–C, without permission to use those patents and without payment of royalties. Continuing to conduct business with only the assets transferred to Paragon by Weyerhaeuser was at least legally too risky, if not practically impossible. Discontinuing use of the technology would cripple the business and paying royalties would virtually eliminate Paragon's profit margin. Weyerhaeuser's suggested interpretation of these warranties would reduce them to little more than simple conveyance clauses. Weyerhaeuser's interpretation is unreasonable in the context of the contracts as a whole and in the context of the facts and circumstances surrounding the IPO transactions.

The testimony of Robert Dowdy, Assistant General Counsel for Weyerhaeuser and Project Manager for the IPO,[32] about his subjective belief concerning the meaning of the warranties is inadmissible

32. Mr. Dowdy is currently Weyerhaeuser's General Counsel.

under Washington law. Mr. Dowdy admitted he did not actually draft the terms at issue, but was instead testifying based on his subjective belief as to what they were intended to accomplish. His testimony, however, would impermissibly import into the warranties an intention not expressed by the wording of the warranties, and would render the sufficiency of assets warranties meaningless. Under Washington law, Mr. Dowdy's testimony about his subjective belief is not admissible to modify the terms of the agreements. *Berg,* 801 P.2d at 229–30; *Lynott,* 871 P.2d at 149.

Weyerhaeuser's suggested interpretation of the sufficiency of assets warranties is unreasonable because it would render them both meaningless and redundant. The IPA and ATA conveyancing clauses employed a general approach of conveying *all* the assets that Weyerhaeuser had and was using in the business, as opposed to a conveyance of only those assets specifically listed on a schedule. Section 3.11(vii) of the IPA warrants that the "Primary Intellectual Property," "Trademarks," and "Secondary Intellectual Property," are "adequate for the continuation of the Business as currently conducted." The terms "Primary Intellectual Property," "Trademarks," and "Secondary Intellectual Property" are already defined in the IPA to mean all of those types and categories of intellectual property rights that Weyerhaeuser "owns and is using in the Business." IPA §§ 1.06, 1.09, 1.10. Given these definitions, Weyerhaeuser's interpretation of the Section 3.11(vii) warranty means it is a warranty that effectively says, "what Weyerhaeuser owns and is using in the Business" is "what Weyerhaeuser owns and is using in the Business." Additionally, the "Transferred Assets" that Section 3.01(d) of the ATA warrants are "sufficient to conduct the Business as now being conducted" are defined on Annex I to the ATA to represent all the various types and categories of tangible and intangible property that Weyerhaeuser owned and was using in its diaper business as of the closing of the IPO. Under Weyerhaeuser's interpretation, this warranty likewise would effectively say nothing more than "what Weyerhaeuser owns and is using in the Business" is "what Weyerhaeuser owns and is using in the Business."

■ Weyerhaeuser's interpretation would convert the warranties into meaningless tautologies. Such an interpretation offends the basic Washington contract interpretation principle that every provision of a contract should be given effect and that no provision should be rendered meaningless. *Grant County Constructors v. E.V. Lane Corp.,* 77 Wash.2d 110, 459 P.2d 947, 953 (1969). An interpretation rendering the warranties meaningless is not a reasonable interpretation. *Stouffer & Knight v. Continental Cas. Co.,* 96 Wash.App. 741, 982 P.2d 105, 110 (1999).

Weyerhaeuser's interpretation would render the warranties not only meaningless on their own terms, but also redundant of other provisions in the contracts that accomplish precisely what Weyerhaeuser contends the warranties were added to accomplish. For example, in the IPA conveyance clauses Weyerhaeuser had already promised it would transfer to Paragon all of the various intellectual property rights Weyerhaeuser owned and was using in the baby diaper business. *See* IPA §§ 2.1, 3.1, 3.2 (conveyancing clauses) and 1.06, 1.09, 1.10 (definitions of what is being conveyed). A similar promise exists in the ATA, at Section 2.01 and elsewhere, where Weyerhaeuser agreed to convey to Paragon the "Assets," which in turn were defined on Annex I to the ATA to be all the various types and categories of assets Weyerhaeuser had and was using

in the Business as of closing. Repeating those promises in the warranties was unnecessary to render them enforceable because in Section 11.02(b) of the ATA, Weyerhaeuser indemnified Paragon for any breach of any covenant or agreement, and that indemnity encompassed the covenant to convey all assets that Weyerhaeuser used in the Business.

Weyerhaeuser's interpretation of the "sufficiency of assets" warranties also appears unlikely when compared to the warranty in Weyerhaeuser's own Scott Health Care sale agreement mentioned above. That agreement, for the sale of Paragon's sister division that sold adult incontinence products, was negotiated by the same Weyerhaeuser project team that handled the Paragon IPO, and was signed approximately four months before the first iteration of the sufficiency of assets warranty was added to Section 3.11(vii) of the IPA. Section 5.5 of the Scott Health Care agreement included the following warranty:

> The Purchased Assets, together with the Facility, constitute all of the assets held for use or used by Seller in the Business as presently conducted, **and** such assets are adequate to carry on the Business as presently conducted.[33]

In light of the warranty language Weyerhaeuser itself used in the Scott Health Care agreement, Weyerhaeuser's contention that warranting the transferred assets are "adequate to conduct the Business as currently conducted" is the same as warranting they are "all that are used in a Business" is unreasonable. Assets "sufficient" to operate a given business may be more, the same, or less than the assets a seller owns and is selling. In Paragon's case, it took more than Weyerhaeuser transferred.

Weyerhaeuser also points to the phrase "as currently conducted," which follows the defined term "Business" in the warranties, to argue the warranties were designed only to ensure Paragon that it could operate the baby diaper business Weyerhaeuser was conducting at the time of the IPO, "with all faults, claims and encumbrances." The ATA, by language to the effect that Weyerhaeuser "has been engaged" in the diaper business at various locations, defined the term "Business" to mean the diaper business Weyerhaeuser had historically operated, back to 1972. The "as currently conducted" clause operates to limit the promised asset sufficiency to the baby diaper business Weyerhaeuser was conducting at the time of the IPO, which primarily involved selling the ILG diaper. Absent the qualifying "as currently conducted" language, Weyerhaeuser would have been warranting that Paragon received sufficient assets to sell any product Weyerhaeuser had sold for the preceding 20 years. Instead, the qualifier limited the warranty, and the scope of the promised sufficiency, to the baby diaper business Weyerhaeuser was conducting as of the time of closing, *i.e.*, the business on which the IPO was premised.

Weyerhaeuser's contention that Paragon received only what Weyerhaeuser owned and used in the baby diaper business with all faults, claims and encumbrances would render the sufficiency of assets warranties meaningless for another reason. A conveyance "with all faults, claims and encumbrances" is functionally a quitclaim or an "as is" clause. It contradicts—in fact negates—the common, accepted purpose of a warranty in a sale agreement. Further, it contradicts other warranties in the agreements, such as Section 3.01(c) of the ATA, where Weyerhaeuser warranted the transferred assets were free of claims and encumbrances. An "as is" clause:

---

**33.** JX53, § 5.5 (emphasis added).

generally means that the buyer is purchasing property in its present state or condition ... The term implies that the property is taken with whatever faults it may possess and that the seller or lessor is released of any obligation to reimburse the purchaser for losses or damages that result from the condition of the property. . . .

To the extent an 'as is' clause negates express or implied warranties, it operates as a disclaimer and is not favored in the law. Therefore, Washington courts have added two conditions for effectiveness: (1) a disclaimer must be explicitly negotiated or bargained for, and (2) it must set forth with particularity the qualities and characteristics being disclaimed.

*Olmsted v. Mulder,* 72 Wash.App. 169, 863 P.2d 1355, 1358–59 (1993). Nothing in the record indicates that such a disclaimer was ever explicitly made or bargained for, and nothing in the contracts explicitly identifies the warranties and states they have been disclaimed. Under Washington law, therefore, Weyerhaeuser's interpretation must be rejected.

After considering the admissible contextual evidence, the sufficiency of assets warranties are capable of only one reasonable meaning. In the case of the ATA, Weyerhaeuser warranted that the transferred assets were sufficient to conduct the ILG diaper business Weyerhaeuser was conducting as of the February 3, 1993 closing, and, in the case of the IPA, Weyerhaeuser warranted that the Primary Intellectual Property, Trademarks and Secondary Intellectual Property were adequate for the continuation of the ILG diaper business that Weyerhaeuser was conducting as of closing. If, as of the IPO closing, Paragon needed additional assets to continue the operation of the same baby diaper business that Weyerhaeuser had been conducting, the warranties were breached.

## B. The ATA Section 3.01(c) Warranty

 The ATA Section 3.01(c) warranty was made with no qualifications as to Weyerhaeuser's knowledge. It provides, in relevant part:

[Weyerhaeuser] has, and will transfer to [Paragon] at the Closing, good title to all of the other Assets [all assets other than Real Property] ... free and clear of any and all mortgages, security interests, liens, claims, charges, options and encumbrances of any nature whatsoever, except for minor defects and irregularities in title or encumbrances that do not materially impair the use of any such Assets for the purposes for which they are held.

This warranty also has a clear and unambiguous meaning. It constitutes a warranty by Weyerhaeuser that the various non-Real Property assets would be transferred with good title, free and clear of any claim, charge or encumbrance whatsoever.

 An "encumbrance" is any third party's right to, or interest in, property that diminishes the value of the property. *Hebb v. Severson,* 32 Wash.2d 159, 201 P.2d 156, 160 (1948). A party is liable for patent infringement if it "without authority makes, uses, offers to sell or sells any patented invention." 35 U.S.C. § 271(a) (2001). A "patent" is an "encumbrance" because it is a "franchise granting the right to exclude everyone from making, using or selling the patented invention without the permission of the patentee." *Reeves Bros., Inc. v. U.S. Laminating Corp.,* 282 F.Supp. 118, 134 (E.D.N.Y. 1968), *aff'd,* 417 F.2d 869 (2d Cir.1969). P & G's and K–C's patent rights that allowed them to threaten to prevent Paragon from using the assets to sell or even manufacture the ILG diapers constitute "encumbrances." Thus, Weyerhaeuser failed to deliver good title to the assets and there-

fore breached the warranty in ATA § 3.01(c).

## C. The IPA Section 3.11(ii) Warranty

The IPA Section 3.11(ii) warranty promised that, "to the best of Weyerhaeuser's knowledge":

Schedules 3.01(a) and 3.01(b) are accurate and complete lists of all Patent Rights and Trademarks, as used in connection with the Business or the Products.

Schedules 3.01(a) and 3.01(b) listed various patent and trademark rights Weyerhaeuser conveyed to Paragon under the IPA. No licenses to use P & G's Lawson and Dragoo patents, or to use K–C's Enloe patents, were listed or conveyed.

"Patent Rights," as used in IPA Section 3.11(ii), is defined in Section 1.04(i) of the IPA to include "rights provided by a United States or foreign patent or similar government-granted right, including reissues or extensions thereof . . . ." This definition is not limited to patents owned by or licensed to Weyerhaeuser, and covers any rights granted to any party by any United States or foreign patent. The IPA defined "Products" to include all of the Products of the Business being sold or in a state of development as of closing (IPA § 1.07), a definition that plainly encompassed the ILG diaper upon which Weyerhaeuser had built the business since 1991. Thus, if a Product of the Business as of closing infringed an outstanding patent, and Weyerhaeuser had means of knowing of the infringement and did not convey to Paragon rights to use the patented technology on Schedules 3.01(a) or 3.01(b) of the IPA, the warranty was breached. Weyerhaeuser knew of the existence of P & G's and K–C's patents and knew that the Business transferred to Paragon was using technology covered by those patents. Therefore, Weyerhaeuser failed to transfer all the patents necessary to operate the Business.

## IV. EACH WARRANTY, AS PROPERLY CONSTRUED, WAS BREACHED

■ Weyerhaeuser's warranty in Section 3.01(d) of the ATA was breached. The Transferred Assets were not sufficient to conduct the Business as it was being conducted at the time of the IPO because the intellectual property rights Paragon needed to sell its ILG private label diapers were not conveyed at the closing of the IPO.

Weyerhaeuser's warranty in Section 3.01(c) of the ATA was also breached. Weyerhaeuser did not convey good title to the non-Real Property Assets, free and clear of any and all claims, charges and encumbrances of any nature whatsoever. Rights under patents that were issued and outstanding as of the closing of the IPO prohibited Paragon's use of the Assets to produce and sell the ILG diaper. Those legal rights were material encumbrances that resulted in claims and an injunction that materially and adversely affected Paragon's business and compelled Paragon to file for bankruptcy. While an injunction enforcing the patent rights did not issue until after the closing of the IPO, the patent rights the injunction enforced existed and were outstanding as of closing and, further, both P & G and K–C had already evidenced an intent to enforce those rights by making demands upon Weyerhaeuser. No reasonable person in the industry could honestly ignore the demands of P & G and K–C and give the warranties Weyerhaeuser provided unless, for financial reasons, they had consciously decided to attempt to defer the risk and cost as long as possible in the hope of transferring it to Paragon— which course is consistent with Weyerhaeuser's actions.

■ A "best of knowledge" warranty, such as the IPA 3.11(ii) and (vii) warranties, is a positive affirmation of fact

subject to the same rules as any other express warranty. *Jeffery v. Hanson*, 39 Wash.2d 855, 239 P.2d 346, 348 (1952). A seller breaches a "best of seller's knowledge" express warranty when the fact warranted is not true and the seller knew or had the means of knowing it was not true. *Roadmaster Indus., Inc. v. Columbia Mfg. Co.*, 893 F.Supp. 1162, 1173–74 (D.Mass. 1995);[34] *Regopoulos v. Waukegan P'ship*, 240 Ill.App.3d 668, 181 Ill.Dec. 384, 608 N.E.2d 457, 461 (1992). Thus, courts have held that a "best of knowledge" warranty is breached, even though the seller denies actual belief of the warranty's falsity, when the seller is shown to be "familiar with" and "aware of" information that is contrary to this belief. *See Regopoulos*, 181 Ill.Dec. 384, 608 N.E.2d at 461; *First Nat'l Bank v. Cann*, 503 F.Supp. 419, 437 (N.D.Ohio 1980), *aff'd per curiam*, 669 F.2d 415 (6th Cir.1982).[35] Under Washington law, a seller cannot protect itself from breach by denying knowledge when it had the means to know and might have acquired it by using ordinary diligence.

*See Collyer v. Egbert*, 200 Wash. 342, 93 P.2d 399, 403 (1939).[36]

Under either a "best of knowledge" standard or an actual knowledge standard, Weyerhaeuser knew that it was missing key assets needed to continue to operate the ILG diaper business as of the closing of the IPO. Weyerhaeuser had in-house and outside patent counsel and was familiar with the ILG patents and their prosecution history. Weyerhaeuser knew the features of its own product. The Seattle litigation between P & G and K–C had been finally resolved on appeal well before closing of the IPO, with no relief from Lawson *and* an impending threat from K–C regarding Enloe. Weyerhaeuser negotiated for a year to obtain a license from P & G to use the ILG technology, but failed when P & G held firm, demanding a 3% royalty that Weyerhaeuser could not agree to pay and still complete the IPO. Weyerhaeuser knew prior to closing it was probably infringing Lawson and was definitely infringing Dragoo. Weyerhaeuser knew both that it potentially infringed K–C's Enloe patent prior to closing and that

**34.** In *Roadmaster*, the court refused to allow the defendants to escape liability for false environmental warranties based upon a "best of the seller's knowledge" qualifier although the seller had not received the results of EPA testing when the stock purchase agreement was signed. *Roadmaster*, 893 F.Supp. at 1169–70, 1173–74. To establish the defendants' knowledge as a matter of law, the court relied on evidence of the seller's communications and meetings with EPA officials prior to and during their negotiations with the purchaser and prior to signing the stock purchase agreement that placed the company on notice of environmental problems. *Id.* at 1169–70, 1177–78.

**35.** *Regopoulos*, 181 Ill.Dec. 384, 608 N.E.2d at 461, held that although the seller denied "actual knowledge," sufficient knowledge was established for a breach of "best of seller's knowledge" warranty given the seller's "familiarity" with and "awareness" of the condition of the building through management,

ownership, and experience. 608 N.E.2d at 461. *Cann* held that "[i]n light of the fact that [the architect] failed to perform his supervision duties adequately, the [architect's] warranty that the quality of the work was consistent with the plans was not to the best of [the architect's] knowledge, information and belief, and thus constituted a material breach of [the warranty]." *Cann*, 503 F.Supp. at 437.

**36.** Weyerhaeuser's knowledge may also be inferred from the documentary evidence in the summary judgment record. *See American Transtech Inc. v. U.S. Trust Corp.*, 933 F.Supp. 1193, 1199–1200 (S.D.N.Y.1996) (summary judgment granted where breach of "best of seller's knowledge" warranty was established in part by documents and any lack of knowledge was the fault of the seller). *Cf. Partridge v. City of Seattle*, 49 Wash.App. 211, 741 P.2d 1039, 1042 (1987) (knowledge can be inferred from notice given).

Paragon would unquestionably infringe an amended version of Enloe that would issue after the closing. Weyerhaeuser's game plan, clearly, was to stall, delay and postpone the inevitable financial disaster and assume a naïve posture when possible. Weyerhaeuser was neither naïve nor innocent. Weyerhaeuser walked Paragon off the plank.

Weyerhaeuser offered time and again before the closing of the IPO to pay royalties for Enloe and Lawson, and knew it needed the ILG patents so badly that it would have licensed them in an "instant" if an affordable deal could have been cut.[37] Weyerhaeuser had offered cross-licenses for its own $6 million patent portfolio in exchange for ILG license rights, but its offers were declined. From its experience in 1985 with the Buell Litigation, Weyerhaeuser knew the dangerous stakes of patent litigation with P & G, and the consequences of an injunction. Weyerhaeuser knew the difficulty of proving invalidity of a highly innovative patent.

Weyerhaeuser knew it had built Paragon's business on the ILG diaper. Beginning in 1991, Weyerhaeuser had unsuccessfully tried to design around the ILG patents and find a market-acceptable alternative, but as of the closing of the IPO, Paragon had no alternative design—no retreat product position. During the Federal Circuit appeal, both P & G and K–C, vigorous competitors from whom Weyerhaeuser had taken business through use of the ILG diaper, had made clear their intention to pursue competitors on these patents, and both P & G and K–C had shown a willingness to litigate. Weyerhaeuser's knowledge of the patent deficiency exceeded the amount sufficient to establish a breach of the "best of knowledge" warranty.

The use of the word "continuation" in the IPA 3.11(vii) warranty makes it conspicuously forward-looking. IPA 3.11(vii) warrants that Paragon would be able to continue conducting the same baby diaper business in the future that Weyerhaeuser was conducting at the time of the IPO. Weyerhaeuser would not normally be liable under a sufficiency of assets warranty for new patents affecting Paragon's business that issued after the closing. Based, however, on the decision of the Federal Circuit appeal between P & G and K–C and the judgment in the PTO interference action (both of which issued before closing of the IPO), Weyerhaeuser knew prior to closing that an amended version of Enloe would issue, broadening the Enloe claims to encompass *all* ILGs, whether impermeable or fluid pervious. K–C's final demand letter and offer to license Enloe in late December, 1992, included the to-be-issued amended Enloe patent encompassing all ILGs. SF103. Thus, Paragon's lack of Enloe patent rights, together with the lack of Lawson/Dragoo patent rights from P & G, made the intellectual property portfolio Weyerhaeuser sold inadequate for the "continuation" of the diaper business after the closing.

The sufficiency of assets warranties must be evaluated in the context of the transaction forming Paragon, a company that would be only a fraction of the size of Weyerhaeuser. If the risk and potential damages from not having P & G ILG patent rights was "enormous" (see n. 15) as to Weyerhaeuser, as its General Counsel advised the auditors a year before the IPO closing, the risk and potential consequences of the P & G claims to Paragon, a much smaller company dependent on the ILG product, would have been staggering, particularly when that risk would double by enlargement of the Enloe patent's

---

**37.** Abraham Dep. 213–16.

claims to encompass all ILGs. Paragon's business was built on the ILG diaper and it had no alternative product. Weyerhaeuser itself could not afford to pay a royalty for the technology needed to produce that diaper and still remain competitive. Therefore, Weyerhaeuser breached the two sufficiency of assets warranties.

Finally, Weyerhaeuser breached the IPA Section 3.11(ii) warranty. Schedules 3.01(a) and 3.01(b) to the IPA, which listed various patent and trademark rights being conveyed, did not list Lawson, Enloe, or Dragoo. In legal sense, Weyerhaeuser at the very least knew or had means of knowing of the existence of those patents and that it was using technology covered by those patents in the "Products" and "Business" as of closing. In common sense, its actions were knowing and deliberate.

## V. SECTION 4.01 OF THE IPA DOES NOT PRECLUDE THE BREACH OF WARRANTY CLAIMS

■ Weyerhaeuser contends that Section 4.01 of the IPA precludes Paragon's breach of warranty claims as a matter of law. IPA Section 4.01 provides as follows:

*Patent Trade Secret or Trademark Claims.* Paragon shall be obligated for and hereby agrees to indemnify, defend and hold harmless Weyerhaeuser for, from and against any and all liability, expense and costs asserted against, imposed on, or incurred by Weyerhaeuser, directly or indirectly, for patent, trade secret, copyright or trademark infringement or other similar claims involving products, processes, materials and/or equipment relating to the Business or Products made, used or sold prior to, on or after the Closing Date. The indemnification procedures set forth in Section 11.03 of the Asset Transfer Agreement shall apply with respect to the indemnification provided in this Section 4.01.

As Weyerhaeuser had operated the diaper business before closing as an internal division, and not as a separate subsidiary, Weyerhaeuser conveyed the assets to Paragon at closing, pursuant to the IPA, ATA, and other documents. In this asset sale, as in other asset sales, in § 4.01 of the IPA, Paragon contractually assumed a corresponding indemnification for certain liabilities of the business. Like the conveyance of assets, the indemnity and assumption of liabilities were necessary to make a clean transfer of the diaper business to Paragon at closing. Weyerhaeuser did not want to be a co-defendant with Paragon post-closing relating to pre-closing and ongoing business operations.

■ A buyer's agreement to assume a liability in a contract does not negate the buyer's right to sue the seller for breach of a warranty in that same sale agreement. *See Alderney Dairy Co. v. Hawthorn Mellody, Inc.,* 643 F.2d 113, 117 (3d Cir.1981); *Pegasus Mgmt. Co. v. Lyssa, Inc.,* 995 F.Supp. 29, 40 (D.Mass.1998). *See also Bunge Corp. v. Northern Trust Co.,* 252 Ill.App.3d 485, 191 Ill.Dec. 195, 623 N.E.2d 785, 792–93, 795–97 (1993) (awarding damages for breach of warranties regarding patent liabilities of business sold pursuant to a stock purchase agreement). Paragon's agreement to indemnify Weyerhaeuser for patent claims asserted against Weyerhaeuser does not negate or reduce Paragon's right to sue for breach of the contractual warranties. The warranties at issue were part of the same contracts by which the indemnities were issued, and were added to the agreements after Section 4.01 appeared.

Weyerhaeuser argues that allowing the plaintiff to pursue a breach of warranty claim for the infringement losses would render IPA Section 4.01 meaningless. In fact, the reverse is true. Section 4.01's meaning should be evaluated based on the

assumption that the warranties were truthful when made, which is the context in which the IPA and ATA were signed. SF198–99. Section 4.01 was potentially quite valuable to Weyerhaeuser, even as to the overtly threatened ILG claims. At the time of the IPO, the threat of patent litigation regarding the ILG feature could have implicated Weyerhaeuser for the period of nearly two years' ILG diaper sales before the IPO, notwithstanding Weyerhaeuser's assertion that such claims were invalid. Paragon expended millions of dollars defending the P & G litigation alone. Because of Section 4.01, Weyerhaeuser was relieved of the obligation to defend costly patent cases that named Weyerhaeuser as a defendant. If Paragon had prevailed in the P & G contract infringement litigation, the "sufficiency/adequacy" of the intellectual property would have been established as to P & G, and IPA Section 4.01 would have provided substantial economic value to Weyerhaeuser.

The value of Section 4.01 to Weyerhaeuser did not end there. Weyerhaeuser was in a dynamic state of diaper development from 1987–1993. SF21–48. It had dedicated considerable effort from 1987–1990 trying to develop its own branded diaper, SF21–23, and after that project was dropped, Weyerhaeuser redeveloped and sold the Ultra ILG private label diaper. SF24. Weyerhaeuser asserts in its proposed Statement of Fact No. 20 that patent litigation is an inherent risk in the diaper industry. If at any time after 1987 until the IPO's closing in 1993, Weyerhaeuser had unknowingly infringed a diaper patent held by P & G, K–C, or any other party by using a diaper feature that it no longer used in the diaper business as of the time of closing, and the patent holder sued Weyerhaeuser for infringement after the closing, Paragon would have had to defend the case and pay any liability.[38] Paragon would have had no warranty claims such as those asserted here because the infringing feature would not have been used in the Business at closing; also, Weyerhaeuser would have lacked knowledge of the claim and thus avoided a breach of IPA Section 3.11(iv).

Therefore, IPA Section 4.01 had meaning to Weyerhaeuser as written, by eliminating any chance that Weyerhaeuser would have to defend an unexpected patent case relating to its historic operation of the diaper business. Plaintiff's claims on the forward-looking promises set forth in the warranties and the contractual protection given Weyerhaeuser for third party infringement claims are based on completely different legal and factual circumstances.

Weyerhaeuser also attempts to argue, by reference to language excerpted from the final Prospectus for the public offering, that the indemnity and assumption of liability was intended to encompass claims asserted against both Weyerhaeuser and Paragon. However, the Prospectus itself fully qualifies its description of the IPA and the other publicly filed *material contracts* by reference to the agreements themselves. JX327 at 46. To suggest that a publicly-filed material contract was or could be modified either by reference to or by a separate descriptive summary instrument, especially when the summary expressly states that the underlying agreement controls, is an untenable argument.[39]

The indemnity promise in Section 4.01 must also be read in the context of the entire section. The second sentence pro-

---

**38.** The statute of limitations for patent infringement is six years. 35 U.S.C. § 286 (2001).

**39.** Headnotes do not modify holdings of opinions; abstracts do not modify the articles they describe; movie reviews do not change the movie.

vides that "[t]he indemnification procedures set forth in Section 11.03 of the ATA shall apply with respect to the indemnification provided in this Section 4.01." ATA Section 11.03 provides a procedure for seeking indemnity for claims brought by a person or entity "not a party to the [ATA]." Reading Section 11.03 of the ATA together with Section 4.01 of the IPA makes it clear that the "claims" for which Paragon agreed to indemnify Weyerhaeuser in Section 4.01 are claims by *third parties* against Weyerhaeuser for patent infringement relating to the Business. Paragon is not such a third party.

The reference to infringement claims asserted "indirectly" against Weyerhaeuser refers to circumstances in which a Weyerhaeuser customer was sued for selling infringing diapers and sought indemnity from Weyerhaeuser, as occurred in the Buell Litigation.[40] Although the breach of warranty claims arose as a result of the patent infringement claims of P & G and K–C, § 4.01's use of the term "indirectly" is insufficient to bring those claims within the indemnify provisions. Such an interpretation is too tortured to have merit.

Section 4.01 is limited to "patent, trade secret, copyright, or trademark infringement or other similar claims," and it does not mention contractual warranty claims Paragon may have against Weyerhaeuser under the IPA or ATA. Nothing in the language of IPA Section 4.01 encompasses or limits Paragon's own direct breach of warranty claim against Weyerhaeuser. To have done so would have rendered the warranties meaningless and a nullity.

Weyerhaeuser contends that Section 4.01 expresses two different concepts—an indemnity in its favor with respect to direct or indirect claims, and an assumption by Paragon of all patent liabilities, and that the reference to Section 11.03 applies only to the former and not the latter. In this context, Weyerhaeuser emphasizes the first five words of Section 4.01: "Paragon shall be obligated for . . . ." Weyerhaeuser ignores, however, the balance of that sentence, which makes it clear that Paragon's "obligation" and duty to indemnify apply to the same thing, *i.e.*, patent infringement claims asserted against Weyerhaeuser. For that reason, Section 11.03 plainly applies to the entire section and, in context, makes clear that Section 4.01 was intended to address claims by third parties against Weyerhaeuser for patent infringement, not claims by Paragon against Weyerhaeuser for breach of warranty.

Weyerhaeuser's interpretation of IPA Section 4.01 would require the Court to rewrite its terms, and would render the warranties completely meaningless. Such a result is not favored under Washington law. Therefore, Weyerhaeuser's reliance on IPA § 4.01 to relieve it of liability for its breach of warranties is without merit.

## VI. ORDER ON MOTION TO STRIKE

Weyerhaeuser has filed a Motion to Strike the expert witness submissions of four of Plaintiff's expert witnesses to which Plaintiff referred in the Briefs. Those expert witnesses are as follows: (1) Marcus Way, testifying by affidavit; (2) Ronald Fareham, testifying by affidavit; (3) Thomas Arnold, author of an expert witness report;[41] and (4) Bruce Bjerke, testifying by deposition. Weyerhaeuser seeks to exclude the expert witness sub-

**40.** JX2 at 1 ("Weyerhaeuser has indemnified [Montgomery] Ward and [J.C.] Penney for their sales activities of the ELD diapers").

**41.** The parties stipulated and the Court ordered that Plaintiff could use Mr. Arnold's Expert Witness Report in lieu of an affidavit because at the time of the filing of the Summary Judgment papers, Mr. Arnold was seriously ill and unable to execute an affidavit.

missions in their entirety. Weyerhaeuser contends that Plaintiff's expert witness submissions are objectionable because they contain legal conclusions, speculation, and conjecture.[42]

 The admissibility of expert witness testimony in federal courts is governed by RULE 702 of the FEDERAL RULES OF EVIDENCE, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The expert witness submissions of the Plaintiff relate to custom and practice in the mergers and acquisitions industry and in the field of patent law. Washington state substantive law specifically permits custom and usage expert evidence. *See Lynott*, 871 P.2d at 149; *Berg*, 801 P.2d. at 228–29.

 Objections to expert submissions must be addressed to specific statements and not affidavits or reports in general. *See Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 579 (2d Cir.1969); *Jorman v. Veterans Admin.*, 579 F.Supp. 1407, 1411–12 (N.D.Ill.1984); *Lee v. Nat'l Life Assurance Co.*, 632 F.2d 524, 529 (5th Cir.1980). Only if the inadmissible portions of an affidavit are so inextricably combined with the admissible portions as to be impossible to separate is striking the entire affidavit appropriate. *Jorman*, 579 F.Supp. at 1412; *Southern Concrete Co. v. United States Steel Corp.*, 394 F.Supp. 362 (N.D.Ga.1975), *aff'd*, 535 F.2d 313 (5th Cir. 1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). Weyerhaeuser has failed to make such a showing in the instant proceeding. Additionally, review of the two Affidavits, Mr. Arnold's Report, and the Bjerke Deposition, shows that separating the objectionable from the unobjectionable portions is both possible and uncomplicated, and, when considering the evidence, this court has done so. Accordingly, Weyerhaeuser's Motion must be denied. Only the admissible portions of the Plaintiff's expert witness submissions have been considered. Even with respect to the admissible portions, however, the Court has not greatly relied upon them in reaching its conclusions. Indeed, the Court would have reached the same conclusions on the Summary Judgment Motions without the expert witness submissions.

## VII. PLAINTIFF IS ENTITLED TO RECOVER DAMAGES ARISING FROM OR RELATING TO WEYERHAEUSER'S BREACH OF WARRANTIES

Breach of all four warranties is established in this case given the Delaware Court's judgment and injunction. Additionally, during Debtor's Chapter 11 case, orders were entered that approved as reasonable and necessary Paragon's settlements and licenses with both P & G and K–C to acquire ILG license rights.[43] The

---

**42.** Initially, Weyerhaeuser contended that no merger and acquisitions industry exists to which custom and usage could apply, but that contention is without merit. Only someone who has slept through the last 20 years would suggest that corporate mergers and acquisitions do not rely on unique customs and practices which render it a separate "industry" within the corporate community.

**43.** Orders approving settlement agreements with P & G and with K–C were entered August 6, 1999, following extensive hearings on both motions. *See* JX 455.456. Over the

settlements and licenses were necessary for Paragon to continue operations. Those determinations—like the Delaware Court's $178 million judgment and the permanent injunction—confirm that Paragon did not receive sufficient or adequate assets under the ATA and the IPA to operate its business. If it were necessary for Paragon to spend 60% of its operating profit margin in addition to paying claims of more than $100 million to each of two competitors to purchase something it did not have, then it necessarily follows that the assets transferred to Paragon were neither sufficient nor adequate.

Weyerhaeuser held a substantial unsecured claim in the Paragon bankruptcy case and was a member of the Creditors Committee ("Committee"). The Committee was an advocate of the P & G and K–C settlements, and was instrumental in causing them to occur and to be approved. The creditors' support of the settlements was an important factor in the decision to approve them.

Paragon's indemnity claims against Weyerhaeuser were raised in the bankruptcy case before the objection deadlines on the settlements, and this lawsuit was filed well before the Plan was confirmed. Both the Committee by-laws and 11 U.S.C. § 1109(b) (1993), allowed Weyerhaeuser to take action contrary to the Committee in its individual capacity if it determined that the Plan or settlements with P & G and K–C were contrary to its interest as an indemnitor. SF240. Weyerhaeuser took no action to oppose the settlements and license agreements, or to oppose the Plan of reorganization that memorialized their terms.

In Section 11.02(b) of the ATA, Weyerhaeuser contractually agreed to indemnify Paragon for "any and all Losses arising from or relating to" the breach by Weyerhaeuser of any representation or warranty in the ATA or IPA. Section 1.01 of the ATA expressly defined "Loss" to include any "settlement or compromise" relating to any claim.

 Indemnity provisions are interpreted the same as any other contract provision. *Jones v. Strom Constr. Co.*, 84 Wash.2d 518, 527 P.2d 1115, 1117 (1974) (*en banc*); *Knipschield v. C–J Recreation, Inc.*, 74 Wash.App. 212, 872 P.2d 1102, 1104 (1994); *King v. Northwest Wheel, Inc.*, 12 Wash.App. 946, 532 P.2d 1181, 1182–83 (1975). Courts routinely enforce indemnity contracts as written to uphold the parties' bargain, recognizing that an indemnity provision is an integral element of the parties' determination of how the risks of a transaction should be allocated. *See, e.g., McDowell v. Austin Co.*, 105 Wash.2d 48, 710 P.2d 192, 195–96 (1985) (*en banc*) ("This court has long preferred to enforce indemnity agreements as executed by the parties"); *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 124 Wash.2d 789, 881 P.2d 1020, 1032 (1994) (*en banc*); *Union Pac. R.R. v. Ross Transfer Co.*, 64 Wash.2d 486, 392 P.2d 450, 452 (1964); *Prociw v. Baugh Constr. Co.*, 9 Wash.App. 750, 515 P.2d 518, 521 (1973); *Northern Pac. Ry. v. Nat'l Cylinder Gas Div.*, 2 Wash.App. 338, 467 P.2d 884, 887, 889–90 (1970).

Causation has been established given the language of the warranties at issue, each of which gives assurances that Paragon had and would receive all the intellectual property it needed to conduct the ILG diaper business Weyerhaeuser was conducting as of the closing. Weyerhaeuser promised that the intellectual property was sufficient, promised it was conveying,

weeks of hearings on the motions to approve the settlements, the parties presented a tremendous amount of the patent history regarding disposable infant diapers and ILGs. The order confirming Paragon's Chapter 11 plan was entered January 13, 2000. JX 468.

as set forth on IPA schedules 3.01 and 3.02, all patent rights used in the ILG diaper business and in connection with the Products, and promised that the business and assets were not encumbered by infringement claims. These promises were false, and Paragon has suffered damages. Once a breach of warranty is established, a plaintiff is entitled to damages.[44]

## VII. CONCLUSION

For the reasons discussed above, it is hereby

ORDERED, that (1) Defendant's Motion For Summary Judgment and Motion To Strike are denied, and (2) Plaintiff's Motion For Partial Summary Judgment on Liability is granted.

44. *See, e.g., Bunge,* 191 Ill.Dec. 195, 623 N.E.2d at 794 ("Bunge is ... entitled to a purchase price adjustment if warranty (*l* ) was breached").